590 A.2d 552

**Allen Filmore RUNKLES**

v.

**STATE of Maryland.**

**No. 855, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

May 30, 1991.

George E. Burns, Jr., Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Thomas E. Hickman, State's Atty. for Carroll County, Westminster, on the brief), for appellee.

Argued before MOYLAN, BLOOM and DAVIS, JJ.

## PROLOGUE

DAVIS, Judge.

The Thirteenth Amendment to the United States Constitution, ratified on December 6, 1865, abolished involuntary servitude and the corresponding commercial buying and selling of people as chattel. One would assume that the Thirteenth Amendment, if not the Common Law, would prohibit something so fundamentally repugnant and socially unacceptable as the commercial selling of babies.

When a Pennsylvania couple attempted to sell their two-month old son to an undercover Maryland State Policeman in exchange for $3,500.00 in cash and more than three ounces of uncut cocaine, and it appeared that the only penalty for such conduct was a maximum of 90 days in jail and a $100 fine provided for by Family Law art. § 5–327(d), a number of State legislators expressed concern over what they considered to be too lenient a penalty for baby selling. This concern heightened considerably when, several months later, the Circuit Court for Anne Arundel County dismissed the charges against the couple altogether on the ground that the existing provision of the Family Law Article covered only the receipt of sums of money in connection with the placement of an individual in adoption proceedings, and not the selling of babies outside the adoption context. The emotional issues of baby selling and illicit drugs coalesced to unleash a virtual firestorm in the General Assembly, which resulted in the passage of Md.Ann.Code art. 27, § 35C (1957, 1987 Repl.Vol., 1990, Cum.Supp.) enacted as legislation intended to make unlawful the selling of babies.

## THE INSTANT CASE

Against this backdrop, Allen Filmore Runkles—in a case where his actions could be most aptly characterized as influence peddling—was charged with "selling/bartering a child" pursuant to Article 27, § 35C. Appellant's case was

submitted on an Agreed Statement of Facts in the Circuit
Court for Carroll County. A finding of guilt was entered
by the trial judge and on May 16, 1990, appellant was
sentenced to five years imprisonment, of which four years
and three months were suspended in favor of five years
probation. On this appeal, Runkles challenges the suffi-
ciency of the evidence to support his conviction. Because
the relinquishing of custody of young Jason for considera-
tion does not constitute a sale, barter or trade of the child in
contemplation of the statutory prohibition, we reverse.

## Facts

The trial court convicted appellant of child selling. The
statement of charges reads: "It is formally charged that
the defendant ... did sell/barter a child to wit, Jason
Seymour for money." The case was submitted on the
following agreed statement of facts.

On August the 18th, 1989, at 309 Robert's Mill Road in
Taneytown, in Carroll County, the Defendant, Allen Run-
kles, received four thousand dollars in U.S. currency from
a Warren Seymour. That money was paid to the Defen-
dant for persuading JoAnn Bauerlien, the Defendant's
girlfriend at that time into signing custody of her six-
year-old son, Jason Seymour, over to Mr. Warren Sey-
mour, Jason's grandfather.

At that date, Jason, the six-year-old, and his younger
brother, D.J. age three, lived with JoAnn Bauerlien, their
natural mother and legal custodian, and, well, the defen-
dant, Allen Runkles, Mrs. Bauerlien's boyfriend.

Mr. Seymour, who had tried to get custody of Jason in
the past, was contacted by the Defendant on 8/16/89 and
was told by the Defendant on that date that the defen-
dant could persuade JoAnn Bauerlien to sign over custo-
dy of Jason Seymour to Mr. Seymour at a price of four
thousand dollars. According to JoAnn Bauerlien the De-
fendant did persuade her to sign custody of her son to
Mr. Seymour. She denied any knowledge of the Defen-
dant receiving any money from Mr. Seymour.

Mrs. Bauerlien had stated that she was having trouble with her son, Jason,—having difficulties with Jason and her younger son, D.J., age three. Jason had just recently hurt D.J. and JoAnn Bauerlien had stated to the police that she just couldn't take it anymore and that the child be—would be better off and that was why she signed the custody over.

Mr. Seymour, by his attorney, Lanny Harchenhorn, had a Consent to Custody Order prepared for JoAnn Bauerlien to sign. Mr. Seymour was told by the Defendant that he would persuade JoAnn to sign the custody papers Friday night, August the 18th, 1989. When Mr. Seymour came to pick Jason up for his usual visit, all that would be done.

After the papers were signed, the Defendant told Mr. Seymour he would take them and have Mr. Seymour walk with him to the garage out of the presence of JoAnn Bauerlien and they would exchange the custody papers for the four thousand dollars.

As a result of this information given to police by Mr. Seymour, a surveillance was established at the Defendant's residence in 8/18/89. At approximately, six-thirty, Mr. Seymour arrived at the residence. Mr. Seymour produced the custody papers which were prepared by Mr. Harchenhorn and, at which time, JoAnn Bauerlien signed them, giving Mr. Seymour custody of Jason.

The Defendant then took possession of the custody papers from JoAnn Bauerlien and had Mr. Seymour walk toward the back of the residence, toward the garage, Mr. Seymour handed the money to the Defendant as the Defendant exchanged custody papers with Mr. Seymour, all this being observed by the police.

The Defendant was then observed entering the front door holding a white envelope. That envelope contained four thousand dollars, was recovered, and the Defendant was arrested. And that would be the Statement of Facts.

LAW

## Discussion

Appellant asserts that the stipulated facts do not constitute the crime of child selling because the stipulation indicates that he merely "persuaded" Ms. Bauerlien to give up custody of her son, Jason Seymour. Although couched in terms of the sufficiency of the evidence, the issue really is whether the new statute, under which he was charged, covers the kind of conduct he concededly engaged in. In addressing this issue, we start with the statute itself.

Maryland Ann.Code art. 27, § 35C (1957, 1987 Repl.Vol., 1990 Cum.Supp.) provides in pertinent part, that:

(a) *In general.*—A person may not sell, barter, or trade, or offer to sell, barter, or trade a child for money or property either real or personal, or anything else of value.

The Court of Appeals, in *Fowel v. State,* 206 Md. 101, 105, 110 A.2d 524 (1955) observed that, "where the statutory language is plain and free from ambiguity and so expresses a definite and sensible meaning, that meaning is conclusively presumed to be the meaning the legislature intended." "The courts are not at liberty to surmise the legislative intention to be contrary to the words and letters of the statute or to insert or delete words with a view of making the statute express an intention which is different from its plain meaning."

Considering the language of the Statute, the "definition of each of these words encompasses the receipt of something in return for the goods sold, bartered or exchanged as distinguished from a gift." *Rosenberg v. State,* 12 Md.App. 20, 25–26, 276 A.2d 708, *cert. denied,* 263 Md. 719 (1971) (footnotes omitted).

*Webster's Third New International Dictionary* (3d ed. unabr. 1986) defines the relevant words as follows:

To sell: To give up (property) to another for money or other valuable consideration: hand over or transfer title to (as goods or real estate) for a price; to give up in return for something else; to exact a price for.

To barter:  To trade by exchanging one commodity for another.

To trade:  To give in exchange for another commodity; to buy and sell (as stock) regularly;  to give one thing in return for another.

*Black's Law Dictionary* (6th ed. 1990) similarly defines the terms:

Sale:  A contract between two parties, called, respectively, the 'seller' (or vendor) and the 'buyer' (or purchaser), by which the former, in consideration of the payment or promise of payment of a certain price in money, transfers to the latter the title and the possession of property.  Transfer of property as providing of services for consideration.  A transfer of property for a fixed price in money or its equivalent.  *Grinnell Corp. v. U.S.*, 390 F.2d 932, 945, 947, 182 Ct.Cl. 702.  Passing of title from seller to buyer for a price.  U.C.C. § 2–106(1).

*Other Terms Distinguished:*

The contract of 'sale' is distinguished from 'barter' (which applies only to goods) and 'exchange' (which is used of both land and goods), in that both the latter terms denote a commutation of property for property; *i.e.,* the price or consideration is always paid in money if the transaction is a sale, but, if it is a barter or exchange, it is paid in specific property susceptible of valuation.  'Sale' differs from 'gift' in that the latter transaction involves no return or recompense for the thing transferred.  But an onerous gift sometimes approaches the nature of a sale, at least where the charge it imposes is a payment of money.

To barter:  To exchange goods or services without using money.

To trade:  The act or the business of buying and selling for money;  traffic;  barter ... used in three senses: (1) in that of exchanging commodities by barter or by buying and selling for money;  (2) in that of an occupation generally;  (3) in that of a mechanical employment,

in contradistinction to the learned professions, agriculture, or the liberal arts.

That the General Assembly, in our view, did not intend that the statute extend to the facts of the instant case is patent. In enacting the statute, the Legislature chose to define the crime of baby selling in terms more descriptive of a commercial transaction involving goods, wares, and merchandise than one dealing with human beings of any age. With respect to a child, the closest analogy to a sale is the acceptance of money (or something else of value) for giving up a child for adoption. A sale is a transfer of title or ownership for a price. A parent who gives up his or her child for adoption transfers that which is closely analogous to ownership of a child—all rights, privileges, authority, connections, and relationships, as well as responsibilities and duties, of parentage. The child ceases to be the child of the natural parent and becomes the child of the adopting parent.

Merely relinquishing custody of the child is in no way analogous to a sale. The transferor remains the parent of the child and retains many of the rights, privileges, responsibilities and duties of parenthood if not the authority over the child that goes with custody. The child is still the child of the transferor; he does not become the child of the transferee by virtue of the change in custody. Adoption, like a change of ownership, is final and permanent; custody is neither final nor permanent, for it remains subject to judicial review and revision. In commercial law, the transaction in this case involves not a sale, offer of sale, or gift; it most resembles a bailment. The agreement was for possession of the child, not ownership.

Notwithstanding our holding that the statute in question, on its face, cannot be read to proscribe the transfer of custody for consideration, we note that its background as well graphically demonstrates the real legislative intent and purpose behind it. The general rule is that where the language of the statute in question is unambiguous and certain, "then the Court applies its plain and ordinary

meaning." *Taylor v. Dept. of Employment Training*, 308 Md. 468, 472, 520 A.2d 379 (1987). The Court of Appeals, however, in *Kaczorowski v. City of Baltimore*, 309 Md. 505, 515, 525 A.2d 628 (1987) discussed the significance of the context within which unambiguous legislation is enacted:

> Although we did not describe any of the statutes involved in that case [1] as ambiguous or uncertain, we did search for legislative purpose or meaning—what Judge Orth, writing for the Court, described as the 'legislative scheme.' ... We identified that scheme or purpose after an extensive review of the context of Ch. 549, Acts of 1984, which had effected major changes in Art. 27, § 297. That context included, among other things, *a bill request form ..., prior legislation ..., a legislative committee report ..., a bill title ..., related statutes ..., and amendments to the bill ..., in which we considered legislative history (a committee report)* to assist in construing legislation that we did not identify as ambiguous or of uncertain meaning. (Citations omitted, emphasis supplied).

Concerning the sources from which intent may be gleaned, the objectives, and the purposes, the Court further opined:

> However fictional the notion of institutional intent may sometimes be, it is fair to say that legislation usually has some objective, goal, or purpose. *It seeks to remedy some evil*, to advance some interest, to attain some end. If we characterize the search for legislative intent as an effort to 'seek to discern some general purpose, aim, or policy reflected in the statute,' we state the concept more adequately and avoid the fiction. (Citations omitted.)

*Id.* at 513, 525 A.2d 628. (Emphasis supplied).

Applying these principles to this case, we note that the sponsoring Senator of Senate Bill 58, in testimony before the House Judiciary Committee, referred specifically to the

---

1. *State v. One 1983 Chevrolet Van*, 309 Md. 327, 524 A.2d 51 (1987).

Anne Arundel case in which, as noted, the Circuit Court dismissed criminal charges on the ground that Maryland law did not prohibit parents from selling or bartering their babies, but dealt only with the conduct of a third party attempting to gain compensation for brokering an adoption under the Maryland Family Law Article. Initially, the Bill sought simply to enhance the penalty under the Family Law Article.[2]

A Committee Amendment (Committee Amendment No. 3) addressed the problem more directly. It struck the originally proposed language and substituted the language ultimately adopted expressly prohibiting the selling, bartering or trading of children. Equally significant, it removed the proposed legislation from the Family Law Article and inserted it in the Penal Code, under Article 27, § 35C of the Annotated Code.

Thus, the "Summary" of the Floor Report of Bill 58 states:

> This bill increases the penalties for the misdemeanor of charging or receiving prohibited compensation in connection with an adoption. The bill increases the maximum fine from $100 to $10,000 and increases the maximum prison term of imprisonment from 3 months to 5 years.
>
> The bill, as amended, also prohibits a natural or adoptive parent, or anyone acting on behalf of the parent, from either offering to or actually selling, bartering, or trading the parent's child for money, property or anything else of value. A violation of this prohibition would be a misdemeanor subject to the same penalties for baby brokering.

The notation attached to the Floor Report states that "the amendment addresses the concerns of [Senators] about the

---

**2.** The "Bill Analysis" of Senate Bill 58 expressly refers to "the penalty for the misdemeanor of charging or receiving prohibited compensation in connection with an adoption" and indicates that the bill increases the penalty from a maximum fine of $100 to $10,000 and the maximum prison term from three months to five years.

baby selling case that was dismissed in Anne Arundel County."

Thus, we find that there is a clear indication in the legislative history that the legislature was responding to very specific events; the type of transaction reflected in the stipulated facts in this case was apparently never considered by the legislature. The Floor Report, the testimony before the Judiciary Committee on March 21, 1989, and the explanation regarding Amendment No. 3 all demonstrate a legislative intent merely to address the spectre of the commercial sale of babies spurred by the action of the Pennsylvania couple. To read § 35C to include the transfer of custody would render criminally liable any parent (or lawyer) in divorce or custody proceedings wherein as part of a marital agreement, one parent agreed to relinquish a claim to custody in exchange for any other thing of value—visitation, spousal support, or property.

We further conclude from our review of the specific language in § 5–327(a)(1) and (2) that the legislature considered the language, *i.e.*, "renders any service" in conjunction with compensation for adoptions, but declined to use such inclusive language in the penal statute. A review of the agreed statement of facts establishes that appellant received remuneration from the paternal grandfather of the child, in exchange for "influencing the mother," JoAnn Bauerlien, to relinquish custody of the child.

Neither the language of the Statute nor the concerns of the General Assembly lend support to the view that the law applies to the type of transaction described in this case. We accordingly hold that the trial court erred in finding appellant guilty of child selling.

JUDGMENT REVERSED.

COSTS TO BE PAID BY CARROLL COUNTY.

MOYLAN, J., dissents and files opinion.

MOYLAN, Judge, dissenting.

Respectfully, I dissent. As I read the majority opinion, its thrust seems to be that because the criminal statute, art. 27, § 35C, did not incorporate language from Fam.Law Art., § 5–327(a)(1), prohibiting anyone "who renders any service" in connection with an adoption from charging for or receiving any compensation for that service, the conduct of the appellant in this case is thereby not covered by the criminal statute.

I cannot subscribe to the majority's logic because I reject its major premise—that there is a necessary relationship between the criminal statute and the section from the Family Law Article referred to by the majority. I do not read § 35C to be nothing more than a criminal law complement (or supplement) to the Family Law section prohibiting compensation for assisting in an adoption. Section 35C was enacted into law by Chapter 300 of the Acts of 1989. The history of the bill (Senate Bill 58) through the amending process does, indeed, reveal that there were legislators who sought to establish a connection between the two provisions. The words of the ultimate criminal statute speak for themselves, however, and the final draft shows that the Legislature rejected all linkage between the new criminal provision and the preexisting Family Law provision. What is apparent, moreover, is that the Legislature knew the proper words to say if it intended to limit § 35C to activity related to adoption proceedings. On the clear face of the criminal statute, there is no such limitation and no such linkage. To me, § 35C is unambiguous and there is, therefore, no need to resort to more peripheral guidelines of statutory interpretation.

The criminal statute, standing alone, clearly prohibits, in my judgment, any commercial trafficking in children. Had there been any intent to limit it to the adoption context, it would have been easy for the statute so to provide. It contains no such limitation.

The majority opinion's analogy of trafficking in children to the sale of real or personal property is inapt. To transfer total and open-ended custody in a child in exchange for cash would run afoul of the spirit and the letter of the statute as surely as would an agreement to consent to adoption. The notion of "child selling" antedates formal adoption proceedings and would have included, it seems to me, such phenomena from earlier times as selling an unwanted or expendable child to a passing gypsy caravan without any exchange of papers taking place. The phenomenon of selling a child into an apprenticeship for a term of years would also, in my judgment, run afoul of the modern statute. The statute might, indeed, comprehend such shorter term transfers as selling a child into prostitution—for an hour, for a night, for a week. Even as a prostitute might sell or offer to sell her body, a child-trafficker could sell or offer to sell a child's body. Any strained distinction between the transfer of title and the transfer of possession would be totally inapposite.

In my opinion, the subject matter of the statute clearly would embrace the transfer of indefinite custody of the child in exchange for cash. In turning, therefore, to the legal sufficiency of the evidence, contained in the agreed statement of facts, to support the appellant's conviction, we should approach that issue by looking simply to the criminal statute itself and to the available evidence with the aid of those normal tools of analysis provided by the criminal law.

If JoAnn Bauerlien had, in return for $4,000, sold the open-ended and indefinite custody of her son, she would have been guilty of a violation of § 35C. Assuming *arguendo* her criminal involvement, the issue would then become whether the appellant in some accessorial capacity shared her guilt. Had he acted as her agent, middleman, or broker in the hypothesized sale, he would be guilty as a principal in the second degree, regardless of whether he personally had any authority to transfer the child's custody or not. Had he encouraged, assisted, induced, or counselled JoAnn Bauerlien beforehand, he would be guilty as one

acting as an accessory-before-the-fact. The distinction between the two forms of accessoryship would be meaningless, moreover, because in the case of a misdemeanor, such as § 35C, all parties are principals.

This avenue of analysis, however, turns out to be a blind alley for, generally speaking, there cannot be a guilty accessory unless there is a guilty (not necessarily convicted, but nonetheless guilty) principal in the first degree. The limited data available in the agreed statement of facts showed JoAnn Bauerlien to be not guilty of any knowing participation in a sale. The agreed statement includes her denial of any knowledge of money being received from Warren Seymour. It included her further averment that she was signing over the custody of her child simply in the best interests of that child. If she were not a principal in the first degree, the appellant could not then be an accessory to a crime that never occurred.

Section 35C, however, does not limit itself to prohibiting one to 1) sell, 2) barter, or 3) trade a child, acts which only JoAnn Bauerlien could do directly. It goes on, significantly, also to prohibit one to 1) offer to sell, 2) offer to barter, or 3) offer to trade a child. If the criminal action under review were that of selling, the appellant would be no more than a principal in the second degree and his guilt would be contingent upon proof of the complicity of JoAnn Bauerlien. If the criminal action under review were that of offering to sell, on the other hand, then the appellant would be a principal in the first degree and his guilt would not be contingent upon the complicity of anyone else.

This is where, in my opinion, the majority opinion is flawed. It analyzes the appellant's conduct in terms of "influence peddling" and of "merely 'persuad[ing] Ms. Bauerlien to give up custody of her son, Jason Seymour." I think the significance of the appellant's conduct in this case is not what he did vis-a-vis JoAnn Bauerlien but, rather, what he did vis-a-vis Warren Seymour.

In assessing the legal sufficiency of the evidence to support a conviction, an appellate court is required to take that version of the facts most favorable to the State's case and all inferences in that direction that can permissibly be drawn. The agreed statement of facts included the following:

> "Mr. Seymour ... was contacted by the Defendant on 8/16/89 and was told by the Defendant on that date that the Defendant could persuade JoAnn Bauerlien to sign over custody of Jason Seymour to Mr. Seymour at a price of four thousand dollars."

From this, buttressed by events over the next two days indicating that the appellant had been successful in his persuasion, the permissible inference could have been drawn by Warren Seymour that JoAnn Bauerlien had agreed to the sale and that the appellant was acting as her agent. Indeed, as of his first contact with Warren Seymour, the inference was permissible that the appellant was holding himself out as having apparent authority to broker the sale for JoAnn Bauerlien and to negotiate, as middleman on her behalf, the ultimate sale price. He offered the child for sale whether he had the actual authority to do so or not. The evidence was thus legally sufficient to support the conclusion that the appellant was guilty of *offering* to sell the child. The trial judge was, therefore, not clearly erroneous in rendering a verdict of guilty.

There remains only the pleading problem of whether the indictment adequately charged that the appellant did "offer to sell" the child. Explicitly, it did not. The indictment charged that the appellant unlawfully did "sell, barter and trade" the child. Implicitly, however, the indictment did, in my judgment, charge the appellant with offering to sell the child. I reach this conclusion because of my belief that agreeing to sell, either by offering to sell or by accepting someone else's offer to buy, is a lesser included offense within the greater inclusive offense of the sale itself.

The common law principle that the charging of a greater offense permits a jury to return a verdict on a lesser

included offense has been recognized and approved by the Supreme Court. In *Beck v. Alabama*, 447 U.S. 625, 633, 100 S.Ct. 2382, 2387, 65 L.Ed.2d 392, 400 (1980), it explained:

> "At common law the jury was permitted to find the defendant guilty of any lesser offense necessarily included in the offense charged. This rule originally developed as an aid to the prosecution in cases in which the proof failed to establish some element of the crime charged. But it has long been recognized that it can also be beneficial to the defendant because it affords the jury a less drastic alternative than the choice between conviction of the offense charged and acquittal." (Footnote and citation omitted).

*See also Schmuck v. United States*, 489 U.S. 705, 718–19, 109 S.Ct. 1443, 1451–52, 103 L.Ed.2d 734, 748 (1989).

Indeed, *Keeble v. United States*, 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973), raises the strong implication that this principle, beneficial to the defendant and the State alike, may be constitutionally mandated. Justice Brennan observed for the Court, at 412 U.S. 213, at 93 S.Ct. 1998:

> "Indeed, while we have never explicitly held that the Due Process Clause of the Fifth Amendment guarantees the right of a defendant to have the jury instructed on a lesser included offense, it is nevertheless clear that a construction of the Major Crimes Act to preclude such an instruction would raise difficult constitutional questions."

We placed our unequivocal *imprimatur* upon this principle in *Johnson v. State*, 38 Md.App. 100, 109, 379 A.2d 436 (1977):

> "The clear weight of authority is that conviction of a necessarily included lesser offense is permissible under a document charging a greater offense."

In *Grimes v. State*, 44 Md.App. 580, 583, 409 A.2d 767 (1980), *rev'd on other grounds*, 290 Md. 236, 429 A.2d 228 (1981), Judge Wilner traced with impeccable logic the soundness of such a principle:

"The very element of inclusiveness—the theory that the greater offense necessarily incorporates within it the lesser offense—also means that a conviction of the greater presupposes a finding of guilt on the lesser included offense as well. In algebraic terms, if A is the sum of B and C, the establishment of A of necessity also establishes both B and C. This applies not only to a conviction, but also to a charge. An allegation of A is deemed to include an allegation of B and C, its constituent parts. Thus, upon that rationale, courts have rather consistently held that a charging document is effective to charge and, upon proper proof to permit conviction of, not only the particular offense specifically alleged but, in addition, all lesser offenses necessarily included within it, whether or not they are themselves separately stated. *See* in general 42 C.J.S. *Indictments and Informations*, §§ 271, 272. We concluded directly in *Johnson v. State*, 38 Md.App. 100, 109 [379 A.2d 436] (1977): 'The clear weight of authority is that conviction of a necessarily included lesser offense is permissible under a document charging a greater offense....' *Compare*, however, *Bennett v. State*, 229 Md. 208, 217 [182 A.2d 815] (1962); *Davis v. State*, 39 Md. 355 (1874).

The theory underlying this secondary product of merger is not that it is permissible to convict a person of a crime that has not been charged, but rather that the greater charge includes the lesser. Thus, when a defendant stands trial on the greater, inclusive, charge, he in fact and in law stands trial at the same time on all of the lesser, included, charges as well." [1]

The crime of illicitly selling a thing includes elements, such as the delivery of the product and/or the receipt of the

---

1. On three occasions, the Court of Appeals granted *certiorari* to consider this question. On all three occasions, it concluded that the issue was not properly before it. *Grimes v. State*, 290 Md. 236, 240, 429 A.2d 228 (1981); *Hawkins v. State*, 291 Md. 688, 689, 692, 436 A.2d 900 (1981); *Shell v. State*, 307 Md. 46, 51 n. 2, 512 A.2d 358 (1986). *And see Hook v. State*, 315 Md. 25, 39–40, 553 A.2d 233 (1989).

consideration, that go· beyond the inchoate agreement to sell. The *mens rea* of illicitly selling, however, is such that it necessarily includes the inchoate agreement to sell. That agreement may take either of two alternative and reciprocal forms: 1) an offer to sell or 2) an acceptance of someone else's offer to buy. In either of those alternative forms (should either be declared illegal, as the offer has been declared by § 35C), it would be a lesser included offense within the greater inclusive offense of actually selling. *Cf. Nightingale v. State*, 312 Md. 699, 542 A.2d 373 (1988).

The appellant was implicitly charged with offering to sell. The evidence was legally sufficient to support that charge. I would, therefore, affirm the conviction.