605 A.2d 111

**STATE of Maryland**

v.

**Allen Filmore RUNKLES.**

**No. 95, Sept. Term, 1991.**

Court of Appeals of Maryland.

April 27, 1992.

Robert M. Bell, J., filed dissenting opinion in which Eldridge, J., joined.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for petitioner.

George E. Burns, Jr., Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for respondent.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially assigned.

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

## I

Several years ago two happenings inflamed the public and gave serious concern to Maryland law enforcement authorities. An Anne Arundel County couple sold their child for $3,500 and three ounces of cocaine. A Pennsylvania couple, through an advertisement in a Baltimore newspaper, offered to place their child for adoption upon payment of compensation.

Maryland Code (1984, 1991 Repl.Vol.) § 5–327 of the Family Law Article (FL), under the heading "Prohibited compensation," in effect at the time of the happenings and today, declares in subsection (a)(1):

An agency, institution, or individual who renders any service in connection with the placement of an individual for adoption may not charge or receive from or on behalf of either the natural· parent of the individual to be

adopted, or from or on behalf of the individual who is adopting the individual, any compensation for the placement.

Subsection (a)(2) provides that

[t]his subsection does not prohibit the payment, by any interested person, of reasonable and customary charges or fees for hospital or medical or legal services.

Subsection (b) exempts the Social Services Administration from subsection (a)(1) as to reimbursement for certain costs connected with adoption. Subsection (c) calls for the State's Attorney to prosecute any violation of the section. Subsection (d) makes a person who violates the section guilty of a misdemeanor and subjects a violator upon conviction to "a fine not exceeding $100 or imprisonment not exceeding 3 months, or both, for each offense." [1]

Prosecution for the sale of the child by the Anne Arundel Couple proceeded under FL § 5–327 in the Circuit Court for Anne Arundel County.[2] The judge held that the sale was not within the contemplation of the statute. He dismissed the case. The adoption advertisement was pursued in Pennsylvania with the assistance of Maryland enforcement authorities. A conviction was obtained under a Pennsylvania law comparable to that of Maryland, but authorizing a much harsher penalty than does the law of this State proscribing such conduct. The Maryland law enforcement

---

**1.** Maryland Code (1984, 1991 Rep.Vol.) § 5–327 of the Family Law Article was interpreted in *In re Adoption No. 9979*, 323 Md. 39, 591 A.2d 468 (1991). Judge McAuliffe, speaking for the Court, carefully traced the legislative history of the statute, and determined that compensation to natural parents was within its ambit, and that it prohibited not only payments which resulted in a profit but also payments for expenses if not within the exceptions of subsection (a)(2). *Id.* at 41–42, 591 A.2d 468. In reaching its holdings, it was apparent that the Court was satisfied that the statute did not prohibit compensation except with respect to adoption proceedings.

**2.** The sale was a sting set up by the police, who apparently were alerted by a rumor that the couple had previously sold another of their children for $5,000.

authorities were disturbed because the Maryland statute called for a much more lenient penalty.

The public clamor resulting from the dismissal of the prosecution for the sale of the child, and the concern regarding the adequacy of the existing law, led to the enactment of remedial legislation by the General Assembly of Maryland. Acts 1989, ch. 300 (Senate Bill 58) appears in the Maryland Code (1957, 1992 Repl.Vol.). Article 27, § 35C, under the heading "Child Selling." It declares, in subsection (a):

> A person may not sell, barter, or trade, or offer to sell, barter, or trade a child for money or property, either real or personal, or anything else of value.

Subsection (b) makes a person who violates the section guilty of a misdemeanor and on conviction subjects the person to "a fine not exceeding $10,000 or imprisonment in the penitentiary not exceeding five years or both for each offense." [3]

## II

Shortly after the effective date of Article 27, § 35C, the State called upon the new statute in a criminal information filed in the Circuit Court for Carroll County. The circum-

---

**3.** Acts 1989, ch. 300 designated the section as § 35B, but it was later redesignated as § 35C.

Acts 1991, ch. 371 repealed and reenacted Art. 27, § 35C without amendments. But § 2 of the chapter provided that
> there is no statute of limitations for a misdemeanor punishable by imprisonment in the penitentiary, notwithstanding any holding or dictum to the contrary in *Massey v. State,* 320 Md. 605, 579 A.2d 265 (1990).

Ch. 371 amended Maryland Code (1974, 1989 Repl.Vol.) § 5–106(b) of the Courts and Judicial Proceedings Article to provide:
> Notwithstanding Article 27, § 690(e) of the Code, if a statute provides that a misdemeanor is punishable by imprisonment in the penitentiary, the State may institute a prosecution for the offense at anytime.

Maryland Code (1957, 1992 Repl.Vol.) Art. 27, § 690(e) declares that sentence to an institution was to be construed to mean sentence to the jurisdiction of the Division of Correction.

stances which prompted the information were brought out at the trial. Involved were

Jason Seymour, a child, six years of age;

JoAnn Bauerlien, the child's mother;

Warren Seymour, the child's grandfather;

Allen Runkles, the live-in boyfriend of the child's mother;

Lanny Harchenhorn, attorney at law, representing the grandfather.

The second count of the information charged that Runkles on or about the 18th day of August, 1989, at [Carroll] County ... did then and there sell/barter/trade/offer to sell/offer to barter and offer to trade a child, to wit: Jason Seymour, for money/real property/personal property and anything of value, in violation of Article 27, section 35B of the Annotated Code of Maryland....[4]

Runkles waived a trial by jury and elected to be tried on an agreed statement of facts. We give an aperçu of the statement.

The child, his three year old brother, and Runkles lived with the mother, the child's legal custodian as his natural parent. The grandfather had attempted, unsuccessfully, to obtain custody of the child in the past. Runkles approached the grandfather with the proposition that for $4,000 he would persuade the mother to grant custody of the child to the grandfather. The plan, as devised by Runkles, was that the grandfather's attorney would prepare a "Consent to Custody Order" for the transfer of the custody of the child to the grandfather. Runkles would persuade the mother to sign the order, so that when the grandfather came to the mother's residence for his usual visit to see the child, the mother would execute the consent order. Then, out of the presence of the mother, Runkles would turn the executed

---

**4.** The information was amended in open court to correct the designation of the section to read § 35C.

The first count of the information, charging Runkles with extortion, was nol prossed.

order over to the grandfather upon payment of $4,000. The grandfather had his attorney prepare the order and brought it with him on his visit to see the child. Sure enough, without further ado, the mother signed it. Runkles and the grandfather left the house and walked toward the garage. Out of the presence of the mother, Runkles turned over the custody papers to the grandfather, and the grandfather gave Runkles a white envelope. Runkles reentered the house, holding the white envelope.

After hearing Runkles's proposition, however, the grandfather had gone to the police. By means of a covert surveillance, the police observed the entire transaction between Runkles and the grandfather. When Runkles reentered the house, the police pounced. The white envelope contained $4,000. Runkles was arrested.

It was conceded at the very beginning of the agreed statement of facts that the grandfather paid Runkles $4,000 "for persuading [the mother] into signing custody of the child over to the [grandfather]." The mother admitted that she was so persuaded by Runkles, but she disavowed any knowledge of the payment of money. She said that she was "having trouble with [the child]—having difficulties with [the child] and her younger son...." The child "had just recently hurt [his brother]." The mother told the police that "she just couldn't take it anymore and that the child would be better off" with the grandfather. That was why, she explained, "she signed the custody over."

After hearing the statement of facts, the trial judge denied Runkles's motion for a judgment of acquittal. Counsel argued on the merits and were in agreement that "it is a new statute and there's absolutely no law." The judge requested counsel to submit written memoranda, and held his decision *sub curia*. Upon consideration of the memoranda, the judge issued a "Memorandum Opinion." He found Runkles guilty of violating the "child selling" statute, Art. 27, § 35C. The judge observed:

[Runkles] argues that [the statute] does not extend to this scenario, where [he] promised to have the mother of the child "sign over" custody for the sum of $4,000.

He continued:

The State contends that the statute was not intended to be limited to only adoption situations.

He ruled:

The court is in agreement with the State's position. The act of signing over custody in this matter is tantamount to the beginning of adoption proceedings and no less significant.

He declaimed:

The child is still being traded for money!

Runkles appealed. His only contention was that the evidence was not sufficient to sustain the conviction. Two judges of the three judge panel of the Court of Special Appeals agreed with him and reversed the judgment of the circuit court. *Runkles v. State*, 87 Md.App. 492, 590 A.2d 552 (1991). As we construe the opinion of the court, the crux of the decision was that Art. 27, § 35C applies only to adoption proceedings. Inasmuch as Runkles's conduct did not relate to adoption of the child, the evidence was deemed to be insufficient. The third member of the panel disagreed. He would affirm, he said, because he believed that the statute was not limited to adoption proceedings but reached "any commercial trafficking in children." *Id.* at 502, 590 A.2d 552. He thought that the evidence was sufficient to establish that the conduct of Runkles violated the statute. *Id.* at 502–508, 590 A.2d 552 (Moylan, J., dissenting).

The State filed a petition for the issuance of a writ of certiorari. It asked us to decide whether

the Court of Special Appeals err[ed] in concluding that Maryland's child selling statute is limited to proscribing for-profit adoptions, as opposed to any for-profit exchange of child custody.

We granted the petition and ordered the issuance of the writ.

## III

### A

Although terse and concise in phrasing, and, at first glance, not defiled by tergiversation, the reach of Art. 27, § 35C is questioned. We do not find, however, that the statute is so clear on its face as to make unnecessary further inquiry concerning the intent of the Legislature. There is a significant difference of opinion among those learned in the law as to exactly what the statute covers. Therefore, once again we are called upon to probe the mind of the Legislature to determine the legislative intent. Over one thousand Maryland appellate opinions since 1965 have addressed "one aspect or another of legislative intent or history, statutory interpretation or construction." *See* M. Miller, *Ghost Hunting: Finding Legislative Intent in Maryland, a Checklist of Sources* p. 2 (1984) (unpublished manuscript available in the Maryland State Library). We are guided by certain rules in bringing the ghost of legislative intent to bay. We have announced, explicated and applied those rules so often in the past that there is no point in repeating them.[5] We shall apply them once again in determining the legislative intent here, emphasizing that

> our endeavor is always to seek out the legislative purpose, the general aim or policy, the ends to be accomplished, the evils to be redressed by a particular enactment.

*Morris v. Prince George's County,* 319 Md. 597, 603–604, 573 A.2d 1346 (1990). We cautioned in *Kaczorowski v. City*

---

**5.** For recent cases discussing and applying the rules, *see Mustafa v. State,* 323 Md. 65, 72–73, 591 A.2d 481 (1991); *In re Demetrius,* 321 Md. 468, 473–474, 583 A.2d 258 (1991); *Morris v. Prince George's County,* 319 Md. 597, 603–604, 573 A.2d 1346 (1990); *Franklin Square Hospital v. Laubach,* 318 Md. 615, 619–620, 569 A.2d 693 (1990); *Kaczorowski v. City of Baltimore,* 309 Md. 505, 513–516, 525 A.2d 628 (1987).

*of Baltimore,* 309 Md. 505, 516, 525 A.2d 628 (1987), quoting *Potter v. Bethesda Fire Department,* 309 Md. 347, 353, 524 A.2d 61 (1987) that " 'results that are unreasonable, illogical or inconsistent with common sense should be avoided....' " And we declared in *Wilde v. Swanson,* 314 Md. 80, 92, 548 A.2d 837 (1988) that we are never

> precluded from consulting legislative history as part of the process of determining the legislative purpose or goal [of the law].

### B

We seek help from the legislative history of Art. 27, § 35C. We have perused all of the items in the legislative file on SB 58, the bill which became Acts 1989, ch. 300 and was codified as § 35C of Art. 27. They provide an insight into the evolution of the statute. The file contained copies of

(1) newspaper clippings reporting the two incidents of "child selling" and stating that "outrage grows over penalties for baby sales." The articles noted that authorities were demanding that harsher punishment be authorized.

(2) a letter from the Deputy State's Attorney for Baltimore County to Senator Paula Hollinger stating that more severe penalties for violating FL § 5–327 were "sorely needed" and requesting that she sponsor legislation to that effect. Enclosed were copies of proposed legislation as drafted by the Deputy State's Attorney and by the Maryland State's Attorneys' Association. Both drafts called for the penalty permitted by FL § 5–327 to be increased to a fine not exceeding $10,000 and imprisonment not exceeding 5 years, or both. The prosecutor said that he and the State's Attorney had discussed the matter "in light of the recent case of 'baby selling' involving a Maryland 'broker' and a Pennsylvania 'baby seller', the case having been initially investigated by Maryland law enforcement officers as a result of an ad in a local publication."

(3) a letter from Senator Hollinger to the Department of Legislative Reference enclosing a copy of the bill prepared by the Deputy State's Attorney for Baltimore County and requesting that legislation be drafted for submission to the 1989 session of the General Assembly "incorporating this language."

(4) a transcript of the testimony of Senator Hollinger before the Senate Judicial Proceedings Committee on "Senate Bill 58, Adoption—Prohibited Compensation—Penalty." She told the committee that it "stiffens the penalty for natural parents, or a broker attempting to gain illegal compensation in return for allowing adoption of their child." She called attention to the dismissal of the Anne Arundel County case and the advertisement in a Baltimore newspaper by a Pennsylvania couple "asking for compensation in exchange for their baby." She said, "State Police together with Pennsylvania authorities agreed to buy the baby for $30,000. The exchange was made in Pennsylvania so the couple is being tried there. Had the trial been held in Baltimore County and the couple found guilty, their maximum fine would be only $100 and/or a maximum 3 month jail sentence." She declaimed, "Selling a baby on the open market is a practice which must be stopped and the only way to stop it is to increase the penalty." She asked for a favorable report on SB 58.

(5) a "Bill Analysis" on SB 58 by the Committee Report System of the Department of Legislative Reference. It summarized the bill:

> This bill increases the penalties for the misdemeanor of charging or receiving prohibited compensation in connection with an adoption. The bill increases the maximum fine from $100 to $10,000 and increases the maximum prison term of imprisonment from 3 months to 5 years.

The analysis gave the bill's background:

> Under current law, the penalty for the misdemeanor of charging or receiving prohibited compensation in con-

nection with an adoption is a fine of up to $100, a prison term of up to 3 months, or both. The increase in penalties is intended to appropriately address the seriousness of the offense of selling or brokering the sale of a child and to bring Maryland's penalties in line with those of its sister state, Pennsylvania.

(6) a copy of a letter from the executive secretary of the Maryland Judicial Conference informing Senator Walter M. Baker, Chairman of the Senate Judicial Proceedings Committee, that the executive committee of the conference "enthusiastically supported SB 58 ..." and that it "favors severe penalties for those who violate the laws concerning compensation in adoption cases." In handwriting on the letter appears "Concurrences 4/5/89."

(7) a copy of a letter from the Department of Human Resources informing Senator Baker that although SB 58 "will have no direct impact on local department practice ... increasing the penalty, for 'baby selling' ... is certainly in the best interest of children, of adoptive parents, and even of birth parents." The letter concluded, "It is something the Department has been interested in seeing happen for years."

(8) a document addressed to the Senate Judicial Proceedings Committee stating that the position of the Department of Human Resources as to SB 58 was "Support," and repeating the language in the Department's letter to Senator Baker.

(9) an unsigned, undated, handwritten document entitled "Explanation of Concurrence." It reads:

SB 58—Adoption—Prohibited Compensation—Penalty

Recommendation: Concur

*Amendments # 1 and 2*

Technical

*Amendment # 3*

This strikes the original language of the bill and substitutes language expressly prohibiting baby selling—

(The amendment addresses the concerns of Senators Cade and Jimeno about the baby selling case that was dismissed in Anne Arundel County—I checked with both of them.)

Apparently, the document was from Senator Baker.

(10) SB 58 as originally drafted and as amended and passed. As first drafted, the bill merely increased the penalty authorized by FL § 5–327(d). Section (1) of the bill was thrice amended. Amendment (1) changed the title of the bill from "An ACT concerning Adoption—Prohibited Compensation—Penalty" to "An ACT Concerning Children—Sale—Barter, or Trade—Penalty." It also changed the purposes of the bill. As originally drafted, it stated that it was "for the purpose of altering the penalties for charging or receiving prohibited compensation in connection with an adoption." As amended the purposes of the bill were said to be to make "it a misdemeanor subject to certain penalties for a person to sell, barter, or trade or offer to sell, barter or trade a child for money, property, or anything of value; and generally relating to prohibitions against a sale, barter, or trade or an offer to sell, barter, or trade a child for anything of value; and generally relating to baby selling and baby brokering."

By amendment (2) the statute was taken out of the Family Law Article and added to Article 27, Crimes and Punishments as § 35B (later § 35C, *see* note 3, *supra*) "under the new subheading 'Child Selling.'"

Amendment (3) struck all the provisions of FL § 5–327(a), (b), (c) and (d) and substituted in lieu thereof the provisions of Art. 27, § 35C(a) and (b) as presently written. Section (2) of the bill provided that it takes effect 1 July 1989. Stamped on copies of the amended bill were statements indicating that the amendments were checked by the Department of Legislative Reference and that the bill passed the House and the Senate.

(11) a Floor Report by the Department of Legislative Reference setting out a summary of the bill:

This bill increases the penalties for the misdemeanor of charging or receiving prohibited compensation in connection with an adoption. The bill increases the maximum fine from $100 to $10,000 and increases the maximum prison term of imprisonment from 3 months to 5 years.[6]

The bill, as amended, also prohibits a natural or adoptive parent, or anyone acting on behalf of the parent, from either offering to or actually selling, bartering, or trading the parent's child for money, property, or anything else of value. A violation of this prohibition would be a misdemeanor subject to the same penalties for baby brokering.

The Report discussed the three amendments. It observed that the third amendment

prohibits a natural or an adoptive parent or *anyone acting on behalf of a parent* from selling, bartering, or trading or offering to sell, barter, or trade the parent's child for money, property or anything else of value. *The amendment is intended to address a concern raised by a representative of the Maryland State's Attorneys' Association* that current law does *not explicitly prohibit baby selling by a parent.* (emphasis added).

(12) a letter from a constituent to Senator Baker voicing support of the bill.

(13) a revised Fiscal Note from the Department of Fiscal Services, Division of Fiscal Research. It indicated that the amended bill would have little effect on State revenues and no effect on local revenues and State and local expenditures.

---

**6.** The Floor Report was inaccurate in several respects. For example, the bill as amended did not increase the penalty for violation of FL § 5–327. Nor was the bill, as amended, limited to "a natural or adoptive parent, or anyone acting on behalf of the parent." It applies to "a person," and so reaches any person, whether acting on behalf of a parent or not.

(14) a letter from the Attorney General of Maryland to the Governor stating that he approved SB 58 for constitutionality and legal sufficiency.

(15) a transcript of the testimony of Senator Hollinger before the House Judiciary Committee expressing her support of the amended bill. She referred to the baby selling incident in Anne Arundel County and the dismissal of the case. She said, "If SB 58 had been enacted, language in the law would have been adequate...."

## C

The legislative history of SB 58 trees the ghost of legislative intent which haunted Art. 27, § 35C and lays it to rest. The history depicts clearly how the intent at the time the bill was conceived had been transformed into an entirely different intent by the time the bill was delivered.

There is no question that the original objective of the bill was to do no more than increase the permissible penalty for violation of FL § 5–327 prohibiting compensation for adoption. The Deputy State's Attorney for Baltimore County, who initiated the crusade, was motivated primarily by the action of the Pennsylvania couple which plainly constituted a violation of the adoption compensation statute. So he was focused on FL § 5–327 and disturbed by the lenient penalty it authorized. He proposed a harsher penalty for violation of the statute. For a time, everyone enthusiastically went along with his proposal, including the bill's original sponsor Senator Hollinger, (Senator Barbara Hoffman was later added as a sponsor), the Maryland State's Attorneys' Association, and the Maryland Judicial Conference. As the bill traveled the road to passage, however, there came the realization that it did not accomplish what was actually desired—a prohibition against "baby selling." As Senator Hollinger observed in her testimony before the Senate Judicial Proceedings Committee, "Selling a baby on the open market is a practice which must be stopped...." And it dawned on those concerned that "the only way to stop it," was not, as Senator Hollinger at first suggested, "to in-

crease the penalty" authorized by FL § 5–327. No matter what the penalty may have been for that statute, the Anne Arundel County couple, who sold their child for money and dope, could not have been found guilty under FL § 5–327 under the ruling of the circuit court. Baby selling, other than as it may relate to adoption, was simply not within the ambit of FL § 5–327. So SB 58 was amended and the amendments were draconian. All of the provisions of the original draft were jettisoned; the bill was rewritten in its entirety. The amendments divorced the bill from FL § 5–327; they severed any and all connections with that statute; they made plain that they washed out any indication or suggestion that the bill was intended to supplement or complement, or relate to, or affect in any way, the adoption-compensation statute. The amendments removed the bill from the Family Law Article and placed it in the Crimes and Punishments Article. The fact is that the amendments not only resulted in entirely new provisions, but in the creation of an entirely new crime, aptly titled "Child Selling." We remind that the "Explanation of Concurrence" stated (*see supra*, document 9) that the third amendment, going to the substance of the bill,

> strikes the original language of the bill and substitutes language expressly prohibiting baby selling....

The "Explanation" noted that the amendment addresses the concern of certain senators "about the baby selling case that was dismissed in Anne Arundel County." The declaration of purpose was amended to read that it was

> a misdemeanor subject to certain penalties for a person to sell, barter, or trade or offer to sell, barter, or trade a child for money, property, or anything of value ...

The declaration of purpose continued that, as amended, the bill

> generally relat[ed] to baby selling and baby brokering.

The Department of Legislative Reference in its Floor Report interpreted the amended bill, as

> intended to address a concern raised by a representative of the Maryland State's Attorneys' Association that cur-

rent law does not explicitly prohibit baby selling by a parent.

The short of it is, that, as amended, the only remaining part of the bill as originally drafted was its designation as SB 58.

It is of particular significance that SB 58 left FL § 5–327 absolutely untouched. FL § 5–327 exists today exactly as it was before the passage of SB 58. The Legislature did not alter FL § 5–327 an iota; it remained unchanged in every respect, even as to the criticized penalty provision. So now there are two statutes in effect, one intended to prohibit the sale of the adoption of a child, and the other intended to prohibit generally the sale of a child. Neither one is tied to the other one. *See In re Adoption No. 9979*, 323 Md. at 45–48, 591 A.2d 468. Also, Judge Eldridge dissenting, joined by Judge Rodowsky, expressed the belief that Art. 27, § 35C was enacted as a separate statute from FL § 5–327. *Id.* at 62–63, 591 A.2d 468. He pointed out:

Moreover, in House Bill 491 of the 1990 session, the language of Art. 27, § 35C, would have been added to the adoption subtitle of the Courts and Judicial Proceedings Article. House Bill 491, however, was not enacted.

## IV

### A

■ The question presented by the State's petition for certiorari and accepted by us in our grant of the petition, has two facets. The first is whether Art. 27, § 35C "is limited to proscribing for-profit adoptions...." When this facet of the question is viewed in the glare cast by the legislative history of the statute, it is obvious that the answer is that there is no such limitation. As we have seen, Art. 27, § 35C ended up with no tie to FL § 5–327; the two statutes are separate and distinct. The answer to the first facet of the question is that the Court of Special Appeals erred in holding that Art. 27, § 35C is limited to for-profit adoptions.

## B

In asking whether Art. 27, § 35C is limited "to proscribing for-profit adoptions," the State posed its question in terms of "as opposed to any for-profit exchange of child custody." This raises the second facet of the question. Given that the statute's prohibitions are not limited to "for-profit" adoptions, the second facet calls for a determination of what the Legislature intended that the statute cover.

We have no doubt whatsoever that when the Legislature declared that a person may not sell, or offer to sell,[7] a child for anything of value, it intended that the prohibition have a broad reach. We arrive at this conclusion not only from the manner in which, and the reason why, the bill as originally drafted was amended, but from the tenor of the testimony of the original sponsor of SB 58, the comments of the chairman of the Senate committee considering the bill, the summary of the amended bill by the Department of Legislative Reference and other documents in the legislative file. We determined, *supra*, that the reach of the statute was not limited to adoption proceedings. In the light of the clear general aim of the Legislature, which as expressed by the bill's sponsor, was that "selling a baby on the open market must be stopped," and considering the ends the statute sought to accomplish, namely, to stop baby selling, and the evils it sought to redress, that is, trafficking in children, to say that the Legislature intended other than that the statute reach far and wide would not only be unreasonable and illogical, but inconsistent with common sense. But the Legislature did not define what it meant by "sell, barter or trade a child."

## C

Regardless of all that may be encompassed in the phrase "sell, barter or trade a child," we are only called upon in this case to determine whether consent to the

---

7. For purpose of decision here, we make no distinction with respect to "sell," "barter," and "trade."

relinquishment of the custody of a child upon payment of money is within the ambit of Art. 27, § 35C. The full sweep of the statute must await another day; we do not now mark the precise boundaries of the entire area which the Legislature intended to cover.

Judge McAuliffe, speaking for the Court in *Taylor v. Taylor,* 306 Md. 290, 508 A.2d 964 (1986) explained "custody." He said:

> Embraced within the meaning of "custody" are the concepts of "legal" and "physical" custody. Legal custody carries with it the right and obligation to make long range decisions involving education, religious training, discipline, medical care, and other matters of major significance concerning the child's life and welfare. Physical custody, on the other hand, means the right and obligation to provide a home for the child and to make the day-to-day decisions required during the time the child is actually with the parent having such custody.

*Id.* at 296, 508 A.2d 964 (*see* cases cited therein).

■ In the light of the legislative intent that Art. 27, § 35C have a broad reach, we find it patent that ordinarily a consent to the transfer of legal and physical custody of a child for money is proscribed by the statute.[8]

## V

### A

■ Our determination that Art. 27, § 35C ordinarily reaches the consent to a transfer of the physical and legal

---

**8.** The majority in *Runkles v. State,* 87 Md.App. 492, 590 A.2d 552 (1991) suggested, at 501, 590 A.2d 552:

> To read § 35C to include the transfer of custody would render criminally liable any parent (or lawyer) in divorce or custody proceedings wherein as part of a marital agreement, one parent agreed to relinquish a claim to custody in exchange for any other thing of value—visitation, spousal support, or property.

We do not agree. We cannot conceive that the Legislature so intended. Such an interpretation is to be avoided as unreasonable, illogical, and inconsistent with common sense.

custody of a child for money, does not resolve this appeal. We do not find in the record before us the "Consent to Custody Order" which the mother signed. But we glean from the comments of the trial judge and the mother that the consent included both the legal and physical custody of the child. Runkles advances no suggestion to the contrary. In other words, the trial judge and the parties were content that the mother consented to the relinquishment of all of her rights and obligations with respect to the child by way of the transfer of his custody to the grandfather. *See Frye v. Frye,* 305 Md. 542, 558–561, 505 A.2d 826 (1986). The mother's conduct, however, was in nowise criminal. According to the agreed statement, she knew nothing about the payment of money for her consent. Thus, she did not violate Art. 27, § 35C because her conduct lacked an essential element of that statute—the intent that the exchange of custody be for "money or property, either real or personal, or anything else of value." She did not violate FL § 5–327, even though her consent to custody may have led to adoption by the grandfather, because she had no intent that the child be sold, bartered or traded for compensation. She did not desert or wilfully fail to support the child, a misdemeanor under FL § 10–203. Nor, charged with the care, custody, and control of the child, did she desert the child with the intent that the child became a public charge or without providing for the child's support for three years, a misdemeanor created by FL § 10–219. No matter how the mother may be judged morally, she was legally blameless; she was an innocent party in the affair. The question boils down to whether the evidence was legally sufficient to establish that Runkles committed the crime created by Art. 27, § 35C.

### B

The test for the legal sufficiency of the evidence to sustain a conviction of a crime is

"whether the evidence either shows directly or supports a rational inference of the facts to be proved, from which

the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged."

*Wilson v. State,* 261 Md. 551, 564, 276 A.2d 214 (1971), quoting *Williams and McClelland v. State,* 5 Md.App. 450, 459, 247 A.2d 731 (1968). The facts to be proved are those necessary to establish the corpus delicti of the offense charged and the criminal agency of the defendant. The corpus delicti of the offense charged here is that of the crime created by Art. 27, § 35C, namely, the sale, barter or trade of a child for anything of value. The criminal agent alleged is Runkles. We start with our determination that the consent to the transfer of the legal and physical custody of a child in exchange for money is ordinarily the sale, barter, or trade of a child proscribed by Art. 27, § 35C. The evidence supplied by the agreed statement of facts was legally sufficient to establish that a child was involved, that the child was sold, bartered, or traded in that the consent of the mother paved the way for the transfer of the custody of the child to the grandfather, and that something of value, namely money, was paid therefor. Thus, the corpus delicti of Art. 27, § 35C was proved. There remains whether the evidence was legally sufficient to show the criminal agency of Runkles.

Of course, Runkles himself did not have the right or authority to consent to the transfer of the custody of the child. But he brought the consent about by acting through an innocent human agent, the mother. Inasmuch as we have determined that the consent to transfer custody of a child for money in the circumstances here is a misdemeanor under Art. 27, § 35C, Runkles's participation made him a principal therein. *Stebbing v. State,* 299 Md. 331, 372, 473 A.2d 903 (1984); *Novak v. State,* 214 Md. 472, 478, 136 A.2d 256 (1957). As a principal acting through an innocent human agent, he was culpable. *Johnson v. State,* 303 Md. 487, 510, 495 A.2d 1 (1985); *Tichnell v. State,* 297 Md. 432, 444, n. 5, 468 A.2d 1 (1983); *State v. Ward,* 284 Md. 189, 197, 396 A.2d 1041 (1978), appeal after remand, 290 Md. 76, 427 A.2d 1008 (1981).

One who uses an intermediary to commit a crime is not ordinarily a principal in the first degree. It is otherwise, however, when the crime is accomplished by the use of an innocent or irresponsible agent, as where the defendant causes a child or mentally incompetent or one without a criminal state of mind (most likely because the defendant has misled or withheld facts from him) to engage in conduct. In such a case the intermediary is regarded as a mere instrument and the originating actor is the principal in the first degree. The principal is accountable for the acts or omissions of the innocent or irresponsible person, and the principal's liability is determined on the basis of that conduct and the principal's own mental state.

LaFave & Scott, *Criminal Law*, § 6.6 (2d ed. 1986) (footnotes omitted). "One may incur criminal guilt by procuring the harm to be done by the hand of another whether the other is also culpable or acts as an innocent agent." Perkins & Boyce, *Criminal Law* Ch. 6, § 6 (3d ed. 1982). "A person may also be guilty himself as the sole perpetrator ... if he procures the commission of an offense by an innocent human agent...." Clark & Marshall, *A Treatise on the Law of Crimes* § 4.00 (Barnes rev. (1967)). *See* also *1 Bishop on Criminal Law*, § 629 (9th ed. 1923).

Runkles's conduct renounced the legislative purpose of the statute; it denigrated the general aim and policy of the Legislature; it was contrary to the ends intended to be accomplished; it mocked the evils to be redressed. We are not dissuaded from our view by the argument that Runkles sold only his influence. The loophole Runkles seeks is simply not viable. It was because of him that the mother agreed to relinquish her custody of the child; she had resisted the grandfather's previous attempts to obtain custody. Despite her rationalization, after the fact, to explain why she allowed herself to be persuaded by Runkles, the child would have remained with her except for Runkles's intervention. Certainly, the grandfather so believed; he offered to pay Runkles $4,000 to intervene. Runkles, to all intent and purpose, "sold" the child within the contempla-

tion of the statute, and the evidence was legally sufficient for the trial judge as trier of fact to so find. The evidence supplied by the agreed statement of facts was enough to prove the corpus delicti of the crime charged and the criminal agency of Runkles. The trial judge could fairly be convinced, on the evidence before him, of Runkles's guilt. The verdict of guilty was not erroneous.

We hold that the Court of Special Appeals erred in reversing the judgment of the Circuit Court for Carroll County.

THE JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED;

CASE REMANDED TO THAT COURT WITH DIRECTION TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY;

COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT.

McAULIFFE, Justice, concurring.

I join in Parts I–IV of the Court's opinion. I concur in the result, not for the reasons stated by the Court in Part V, but for the reasons given by Judge Moylan in his dissenting opinion below, *Runkles v. State,* 87 Md.App. 492, 502–08, 590 A.2d 552 (1991).

ROBERT M. BELL, Justice, dissenting in which ELDRIDGE, J., joins.

Maryland Code (1957, 1992 Rpl.Vol.), Art. 27, § 35C is straightforward in its prohibition:

A person may not sell, barter, or trade or offer to sell, barter, or trade a child for money, for property, either real or personal, or anything else of value.

Moreover, the language it employs is clear, concise, and unambiguous. Consequently, we need not look beyond the statute to discover the intention of the Legislature in enacting it. *See Bacon v. State,* 322 Md. 140, 147, 586 A.2d 18, 22 (1991); *State v. Bricker,* 321 Md. 86, 92, 581 A.2d 9, 12

(1990); *Fowel v. State*, 206 Md. 101, 105, 110 A.2d 524, 526 (1955) ("where the statutory language is plain and free from ambiguity and so expresses the definite and sensible meaning, that meaning is conclusively presumed to be the meaning the Legislature intended.") In that regard, I agree with the State.[1] Unlike the State, however, I believe that the terms should be given their plain and ordinary meanings, rather than meanings which serve to support a desired result.[2]

I am largely in agreement with Judge Davis's well-reasoned, logical opinion.[3] The statute proscribes "selling, bartering, and trading children," or the offer to do so. It does not, expressly, or even implicitly, proscribe any other conduct. Judge Davis, speaking for majority in *Runkles v.*

---

**1.** The majority sees it differently. In its view, the language is not so clear and unambiguous "as to make unnecessary further inquiry concerning the intent of the Legislature." [Op. at 392, 605 A.2d at 115] Assuming that the majority is correct, my position remains the same. The legislative history of the statute makes clear that the Legislature was very much aware of how to fashion a statute that met the needs it perceived to exist. In fact, that history demonstrates that the Legislature did just that in this case. It had the opportunity explicitly to prohibit the exchange of custody of a child for money or anything of value; it chose not to do so, opting instead for very specific language, *i.e.* "sale," "barter," or "trade." That it did so speaks volumes as to what it intended.

**2.** The State and the majority, consistent with the dissenting opinion in *Runkles,* focus on the phrase "commercial trafficking in children" as being the prohibited conduct. There is nothing in the statute nor the legislative history that indicates that was the object of the statute. Indeed, as the opinion of the intermediate appellate court points out, the impetus for the statute was otherwise.

**3.** Without so much as a supporting citation, the majority mischaracterizes the "crux" of the majority opinion of the Court of Special Appeals as holding that "§ 35C applies only to adoption proceedings," [Op. at 391, 605 A.2d at 115] perhaps to set up a strawman for its legislative history argument. The Court of Special Appeals held, on the contrary, that the conduct with which the petitioner was charged was not covered by § 35C, *Runkles v. State*, 87 Md.App. 492, 501, 590 A.2d 552, 556 (1991), that that section "cannot be read to proscribe the transfer of custody for consideration." *Id.,* 87 Md.App. at 498, 590 A.2d at 555. It opined that it was designed "to define the crime of baby selling in terms more descriptive of a commercial transaction

*State*, 87 Md.App. 492, 590 A.2d 552 (1991), carefully reviewed the meaning of the terms the Legislature used and concluded, I think correctly, that it did not intend, when it passed the statute, to reach a transaction in which the mere transfer of custody was involved. In my view, it intended to reach the situation in which a parent, or other person covered by the statute, sought to transfer parental rights and responsibilities with respect to the child for money, property, or anything else of value. I do agree with the Court of Special Appeals, moreover, that the statute was not intended, in any event, to reach the petitioner's conduct in this case; it does not prohibit influence peddling, *i.e.*, persuading an innocent person to relinquish custody of a child. That is all that the record reflects the petitioner agreed to do and did. It follows, therefore, that that is all he was paid to do.

I dissent.

ELDRIDGE, J., has authorized me to say that he joins in the views expressed herein.

---

involving goods, wares, and merchandise...." *Id.* To be sure, the court referred to an adoption, but only to point out that giving a child up for adoption is the closest analogy to a commercial sale—the giving up of ownership—of a child. *Id.* That this is so is made clear by what it said, later, concerning the statute's legislative history:

Thus, we find that there is a clear indication in the legislative history that the Legislature was responding to very specific events; the type of transaction reflected in the stipulated facts in this case was apparently never considered by the Legislature. The Floor Report, the testimony before the Judiciary Committee on March 21, 1989, and the explanation regarding Amendment No. 3 all demonstrate a legislative intent merely to address the spectre of the commercial sale of babies spurred by the action of the Pennsylvania couple. To read § 35C to include the transfer of custody would render criminally liable any parent (or lawyer) in divorce or custody proceedings wherein as part of a marital agreement, one parent agreed to relinquish a claim to custody in exchange for any other thing of value—visitation, spousal support, or property.

87 Md.App. at 501, 590 A.2d at 556. The case of the Pennsylvania couple to which reference is made involved an offer by parents to place their child for adoption, in exchange for a sum of money. Another case referred to in the legislative history involved a Maryland couple who actually "sold" their child for cash and cocaine.