# LOLA ALICE KINDLEY ET AL. *v.* GOVERNOR OF MARYLAND ET AL.

[No. 155, September Term, 1979.]

*Decided March 10, 1981.*

The cause was argued before Murphy, C. J., and Smith, Digges, Eldridge, Cole, Davidson and Rodowsky, JJ.

*John T. Enoch,* with whom were *Goodman, Meagher & Enoch* on the brief, for appellants.

*Randall M. Lutz, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for

appellees Governor of Maryland et al. Submitted on brief by *Eileen Franch* for appellees Doe et al.

COLE, J., delivered the opinion of the Court.

This case represents an attack on the right of the State of Maryland to provide funds for abortions performed on indigent and medically indigent women.

Appellants, residents and taxpayers of Montgomery and Baltimore Counties, filed a bill in equity against various state officials, including the Governor, State Treasurer, Comptroller, and Secretary of Health and Mental Hygiene, seeking declaratory and injunctive relief to prevent the funding of abortions and to declare illegal the payment of funds for abortions for indigents for the fiscal year 1978 (July 1, 1977 — June 30, 1978).

Both appellants and appellees filed motions for summary judgment. In a decision rendered on October 29, 1979, the Circuit Court for Anne Arundel County (Turk, J.) ruled that:

1) Maryland Code (1957, 1971 Repl. Vol., 1977 Cum. Supp.), Art. 43, § 42 (a) (1), authorizing the Secretary of Health and Mental Hygiene to administer "a program of comprehensive medical and other care in the State for indigent and medically indigent persons," permits the funding of all abortions.

2) The provision in the Budget Bill for Fiscal Year 1978 entitled "Medical Assistance Provider Reimbursements" was sufficient to permit the funding of all abortions for indigent persons.

3) The provisions in the Budget Bill for Fiscal Year 1978 entitled "Medical Assistance Provider Reimbursements" was not a "lump sum" appropriation within the ambit of the Maryland Code (1957, 1976 Repl. Vol.), Art. 15A, § 12, requiring review of such appropriations by the Board of Public Works.

4) Past and present regulations, adopted by the Department of Health and Mental Hygiene, were and are adequate to support State funding of abortions for indigents.

Appellants noted an appeal to the Court of Special Appeals. Prior to consideration by that court, this Court granted appellants' request for a writ of certiorari.

The primary issue we must consider is whether and, if so, to what extent Art. 43, § 42 (a) (1) of the Maryland Code[1] authorizes the appropriation of public funds for abortions. The appellants ask us to read § 42 (a) (1) in light of the criminal abortion statute still intact at the time the section was enacted. They contend that even if § 42 can be read as permitting some abortions, only those abortions which were legal in 1967 belong to the permitted class. Appellants also maintain that whatever else the term "comprehensive medical and other care" may be read to include, it should not be read to permit what appellants term nontherapeutic abortions.

The current version of Art. 43, § 42, was enacted as Chapter 688, Laws of Maryland, 1967. The precursor to the present statute was enacted in 1945 as Chapter 91 of the Laws of Maryland. The 1945 version provided that the "Bureau of Medical Services, under the direction of the Director of Health, shall (1) administer a program of medical care in the State of Maryland for indigent and medically

---

1. Maryland Code (1957, 1980 Repl. Vol.), Art. 43, § 42 (a) provides in part:

§ 42. Medical care of the indigent — In general.

(a) *Administration of program; contracts with insurers, physicians, etc.; operation of hospitals; formulary system for drugs; use of generic drug having clinical equivalency.* — (1) The Secretary of Health and Mental Hygiene shall administer a program of comprehensive medical and other care in the State for indigent and medically indigent persons, or either of those classes.

(2) (i) For this purpose, the Secretary may contract with insurance companies, nonprofit health service plans, or with individuals, associations, partnerships, incorporated or unincorporated groups of physicians, chiropractors, dentists, podiatrists, optometrists (as defined in § 372 of this article), pharmacists, hospitals, nursing homes, nurses, opticians, and other health practitioners duly licensed or certified in this State who perform services upon the prescription or referral of a physician, for the provision of care for eligible persons. The contracts shall be for a one-year period and may be renewed. Within the provisions of the budget the Secretary is authorized to provide for bedside nursing care for eligible persons.

indigent persons. . . ." In 1967 Maryland elected to partici-
pate in the federal Medicaid Program and broadened the
language of § 42 to be consistent with the scope of that
program.

The Medicaid Program was established by Congress in
1965 as Title XIX of the Social Security Act, a cooperative
federal-state effort to provide a broad range of health care
services to the indigent and medically indigent. Among
others, preventive, rehabilitative, and screening services
were originally provided; now family planning services are
included as well. 42 U.S.C.A. §§ 1396-1396k (1974, 1980
Supp.). Accordingly, the General Assembly amended § 42,
providing in part, that "The State Board of Health[2] shall (1)
administer a program of *comprehensive* medical and *other*
care in the State of Maryland for indigent and medically
indigent persons . . ." (emphasis supplied.)

At the time of the 1967 amendments to § 42, any abortion,
even by a licensed physician, was a criminal offense, except
where the fetus was dead or the physician, after consultation
with one or more physicians, was "satisfied . . . that no other
method [would] secure the safety of the mother." Maryland
Code 1957, 1967 Repl. Vol.), Art. 27, § 3 (repealed by Chap-
ter 470, Laws of Maryland, 1968).

Appellants have requested that we define the term "safety
of the mother" in the criminal statute and limit the abor-
tions which may be funded under § 42 to those which were
legal under criminal law as it existed in 1967. The appel-
lants contend that only those abortions, if any, could have
been intended to be covered by the General Assembly when
it enacted § 42. We find appellants' contention to be without
merit. First we note that § 42 mentions neither abortions
nor any other specific medical procedure. It is phrased in
broad and general terms clearly designed to permit indigent
persons to receive the advantages of whatever health care
may be presently accepted as appropriate in the medical
community. To accept appellants' contention would require

2. "The Secretary of Health and Mental Hygiene" has been substituted
for the "Board of Health" in the current form of the statute.

the absurd result of precluding from coverage any medical procedure which may not yet have been developed, in general use, or legal as of 1967. Thus indigent persons would be denied the benefits of the latest technological advances as well as medicines which may have been in existence in 1967 but were then illegal because their safety or the propriety of their use had not yet been determined.

It is true that in endeavoring to ascertain legislative intent we may consider the circumstances existing and events occurring at the time of the statute's passage, *Mackie v. Town of Elkton*, 265 Md. 410, 415, 290 A.2d 500 (1972); however, we must consider also that our laws are addressed to the future. Where, as here, a statute is phrased in broad general terms, it suggests that the legislature intended the provision to be capable of encompassing circumstances and situations which did not exist at the time of its enactment. 2A A. Sutherland, *Statutes and Statutory Construction* § 49.01 (4th ed. C.D. Sands 1973) (hereinafter cited as *Sutherland).*

In addition, we have said that a construction of a statute which is "unreasonable, illogical or inconsistent with common sense should be avoided." *Comptroller v. John C. Louis Co.,* 285 Md. 527, 539, 404 A.2d 1045 (1979); *accord, State v. Berry,* 287 Md. 491, 413 A.2d 557 (1980); *Board v. Stephans,* 286 Md. 384, 408 A.2d 1017 (1979); *Harbor Island Marina v. Calvert Co.,* 286 Md. 303, 407 A.2d 738 (1979). To freeze the scope of funded health care under § 42 to that available in 1967 would lead to just such a result. It would require that we indulge a presumption that the legislature intended to provide indigents with a system of second rate care.[3]

---

3. Appellants cite two cases said to stand for the proposition that the scope of Medicaid funding authorization should be read in light of the criminal abortion statute still intact at the time the spending authorization was enacted. Roe v. Norton, 522 F.2d 928 (2d Cir. 1975); Roe v. Ferguson, 515 F.2d 279 (6th Cir. 1975). These cases afford appellants scant support. At issue was whether the respective states were *required* to fund certain abortions as a condition of participation in the Medicaid program. The issue before us is whether the language of the state statute is broad enough to *permit* the General Assembly to fund abortions, should it choose to do so. Moreover, in Roe v. Norton, *supra* at 932, the court recognized that the states were free to fund all abortions if they desired, as there was no clear

Having concluded that the meaning of "medical and other care" cannot be interpreted solely in light of treatment available in 1967, we turn to the more difficult task of ascertaining the proper construction. Appellants maintain that whatever else may be within the ambit of "medical and other care," so-called nontherapeutic or elective abortions must be excluded.

The phrase "medical and other care" does not on its face suggest such a limitation in intended coverage. Our research has revealed neither committee reports nor any other legislative history which would allow us to discern with certainty the intent of the legislature. In such a situation the correct approach is to presume a reasonable intent on the part of the legislature. 2A *Sutherland* § 45.12. *Sutherland* also lays down the guiding principle for determining what is a reasonable construction of legislation for relief of the poor:

> "The care of the state for its dependent classes is considered by all enlightened people as a measure of its civilization, and provisions for the proper care and treatment at public expense of the indigent sick, and of those who for other reasons are unable to take care of themselves, is said to be among the unquestioned objects of public duty." Therefore, statutes enacted in fulfillment of this recognized public obligation should at all times be liberally interpreted so that the undesirable social effect resulting from the neglect of the poor may be eliminated. [3 *Sutherland* § 71.08, quoting *Jones v. Cooney,* 81 Mont. 340, 263 P. 429, 430 (1928).]

In our view § 42 was enacted to alleviate some of the hardships of poverty by providing medical care to those who could not afford it. *See Maher v. Roe,* 432 U.S. 464, 469-70, 97 S. Ct. 2376, 53 L. Ed. 2d 484 (1977). These hardships include not only the discomfort of heightened severity or

---

basis for determining that such action would be inconsistent with the broad objectives of the act. Roe v. Ferguson, *supra* at 283, as well, acknowledges that the states have the freedom to decide.

duration of an untreated condition, but the sociological and economic problems which flow directly from inadequate medical care. In addition, the legislature may well regard medical care of a preventive and planning nature as important as providing curative treatment for existing illness. The importance of such services was explicitly recognized by Congress when it amended the Medicaid program to include "family planning services" among the types of care which the participating states are now required to fund. 42 U.S.C.A. 1396d (a) (4) (C). Apparently Congress recognized that health care which is not medically necessary to treat a clinically diagnosable illness may still be deemed not only socially desirable but necessary to the well being of the patient, his family and society. In sum, defining medical care narrowly is inconsistent with reasonable statutory construction.

It is in this light that we consider the extent to which § 42 permits the appropriation of funds for abortions. In 1973, the United States Supreme Court struck down criminal statutes prohibiting abortions at every stage of pregnancy except to save the life of the mother as violative of the constitutional right to privacy. *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973). Among other things, the Court held that "[f]or the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to [the discretion of the pregnant woman and] the medical judgment of the pregnant woman's attending physician." 410 U.S. at 164.

The Court recognized what appellants would have us ignore: that there may exist compelling reasons, other than the risks of physical or mental illness, which may cause the woman and her physician to determine that abortion is appropriate. These may be of an economic, familial, sociological, or emotional nature. Justice Blackmun, speaking for the Supreme Court in *Roe v. Wade*, acknowledged the breadth of such considerations:

Specific and direct harm medically diagnosable even in early pregnancy may be involved. Mater-

nity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood may be involved. All these are factors the woman and her responsible physician necessarily will consider in consultation. [410 U.S. at 153.]

A pregnant woman is unquestionably a person for whom medical care is appropriate and an abortion is certainly one of the medical alternatives for dealing with pregnancy. As we concluded in *Bayne v. Secretary of State,* 283 Md. 560, 575-76, 392 A.2d 67 (1978), "A program of comprehensive medical care for indigent and medically indigent persons is an established primary function of the State. . . . Abortions are a proper aspect of the program at the instance of the legislature."

It is for the woman and her physician, considering all factors relevant to her present and future well-being, to determine what medical procedure is necessary. The very heart of *Roe v. Wade* was that the physician and patient should have the *freedom to choose* the nature of the medical services to be rendered. Nothing in the Supreme Court's subsequent decisions involving abortion funding has altered this premise. These decisions have held only that the states are not *required* to fund either nontherapeutic abortions, *Maher v. Roe, supra* (construing statutory conditions of participation); *Beal v. Doe,* 432 U.S. 438, 97 S. Ct. 2366, 53 L. Ed. 2d 464 (1974) (applying equal protection clause), or medically necessary abortions for which federal reimbursement is unavailable,[4] *Harris v. McRae,* 448 U.S.

---

4. Since September 1976, Congress has prohibited — either by amendment to the annual appropriations bill for the Department of Health, Edu-

297, 100 S. Ct. 2671, 65 L. Ed. 2d 784 (1980). Yet the courts have consistently recognized that both the federal and state governments were free, if they so desired, to fund abortions, including so-called nontherapeutic abortions, under the Medicaid Program. *Maher v. Roe, supra,* 432 U.S. at 480; *Beal v. Poe, supra,* 432 U.S. at 447; *Preterm, Inc. v. Dukakis,* 491 F.2d 121, 134 (1st Cir. 1979); *Roe v. Norton,* 522 F.2d 928, 932 (2d Cir. 1975); *see* Note, *Limiting Public Funds for Abortions: State Response to Congressional Action,* 13 Suffolk L. Rev. 923 (1979). What the courts and commentators have recognized is that the language of Title XIX makes no reference at all to any type of abortion, but that the funding of nontherapeutic abortions, if implemented by Congress or the several states, would not be inconsistent with the broad objectives of the Medicaid Program.[5]

It is in a similar vein that we view Art. 43, § 42. There is no reasonable basis to conclude that a program of "comprehensive medical and other care . . . for indigent and medi-

---

cation and Welfare or by joint resolution — the use of federal funds to reimburse the cost of abortions under Medicaid except under certain specified circumstances. This funding restriction is commonly known as the "Hyde Amendment", after its original congressional sponsor, Representative Henry J. Hyde. The current version of the Hyde Amendment, applicable to fiscal year 1981, provides:

> Notwithstanding any other provision of this joint resolution except section 102, none of the funds made available by his joint resolution for programs and activities for which appropriations would be available in H.R. 7998, entitled the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriation Act, 1981, as passed the House of Representatives on August 27, 1980, shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest has been reported within forty-eight hours to a law enforcement agency or public health service; nor for payments prohibited for drugs or devices to prevent implantation of the fertilized ovum, or for medical procedures necessary for the termination of an ectopic pregnancy: *Provided however,* That the several States are and shall remain free not to fund abortions to the extent that they in their sole discretion deem appropriate. [Pub. L. No. 96-369, § 110, 94 Stat. 1356.]

5. Of course the various "Hyde Amendment" restrictions (*supra* n. 4) have precluded the states from receiving federal money for abortions other than those specified.

cally indigent persons" implies the exclusion of funding for any abortion which the woman and her physician determine to be in her best interest. The statute reflects a broad legislative intent to ameliorate, as far as practicable, the many and varied consequences of inadequate or nonexistent medical care which are the lot of the poor.

Finally we wish to make it abundantly clear that nothing in our opinion today suggests that the State is *required* to fund any abortion. As Justice Powell said for the Supreme Court in *Maher v. Roe, supra,* 432 U.S. at 479, "[W]hen an issue involves policy choices as sensitive as those implicated by public funding of nontherapeutic abortions, the appropriate forum for their resolution in a democracy is the legislature." Through its authority to appropriate funds in the yearly budget bill, the General Assembly is free to limit the conditions under which public funds may be expended for abortions. Indeed it has chosen to do so in the last three budget bills.[6] Clearly the General Assembly has not been denied the opportunity to wrestle with the conflicting value judgments, emotional considerations, and diverse opinions with which the abortion controversy is fraught.

## II

Appellants next contend that the various state officials illegally expended funds for abortions during the 1978 fiscal year because no funds for abortions were legally appropriated by the General Assembly in the Fiscal Year 1978 Budget Bill. Chapter 154, Laws of Maryland, 1977. More specifically, appellants claim a violation of Art. III, § 32 of the Maryland Constitution, which provides in part:

No money shall be drawn from the Treasury of the State, by any order or resolution, nor except in accordance with an appropriation by Law, and every such Law shall distinctly specify the sum appropriated, and the object, to which it shall be applied. . . .

---

**6.** Chapter 518, Laws of Maryland, 1980. Chapter 86, Laws of Maryland, 1979. Chapter 44, Laws of Maryland, 1978.

At the outset, we note that this question is moot. The fiscal year 1978 Budget Bill is no longer in effect and appellants have requested no economic remedy with respect to funds previously spent. We recently stated in *Attorney Gen. v. A.A. Co. School Bus,* 286 Md. 324, 327, 407 A.2d 749 (1979), that "[g]enerally, appellate courts do not decide academic or moot questions. A question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide." Yet, even where a question is technically moot, if the issue is recurring, likely to be raised again, and involves a matter of important public concern, the Court may decide the matter. *Reyes v. Prince George's County,* 281 Md. 179, 300 n. 18, 380 A.2d 12 (1977); *Lloyd v. Supervisors of Elections,* 206 Md. 36, 43, 111 A.2d 379 (1954); *see Hayman v. St. Martin's,* 227 Md. 338, 343, 176 A.2d 772 (1962); *Attorney Gen. v. A.A. Co. School Bus, supra* at 330-34 (Smith, J., dissenting). In this case, however, the Budget Bills for fiscal years 1979, 1980, and 1981 all expressly provided, within the "Medical Assistance Provider Reimbursements" item, that no funds were to be used for abortions except under certain specified circumstances which were set out in detail therein.[7] We conclude, therefor, that the circumstance as described by the appellants is not a recurring one and the issue is moot.

---

**7.** The current Budget Bill, Chapter 518, Laws of Maryland, 1980, provided in part in item 32.01.05.03:

> provided that no part of this General Fund Appropriation may be paid, to any physician or surgeon or any hospital, clinic or other medical facility for or in connection with the performance of any abortion, except upon certification by a physician or surgeon, based upon his or her professional judgment that the procedure is necessary, provided one of the following conditions exist:
>
> where continuation of the pregnancy is likely to result in the death of the woman;
>
> or where the woman is a victim of rape, sexual offense, or incest which has been reported to a law enforcement agency or a public health or social agency;
>
> or where it can be ascertained by the physician with a reasonable degree of medical certainty that the fetus is affected by genetic defect or serious deformity or abnormality;
>
> or where it can be ascertained by the physician with a reasonable degree of medical certainty that termination of pregnancy is medi-

## III

Appellants next contend that the expenditure of funds for abortions from the Medical Assistance Provider Reimbursement item in the fiscal year 1978 budget was illegal because such appropriation is a "lump sum" within the meaning of Maryland Code (1957, 1976 Repl. Vol.), Article 15A, § 12. That section provides:

In any other case where a lump sum is appropriated to any State department, board, commission, officer or institution, such department, board, commission, officer or institution shall be required to submit to the Board of Public Works within ninety days following the adjournment of the General Assembly, a detailed budget schedule in the usual form, showing the proposed apportionment and disbursement of such lump sum appropriation by such department, board, commission, officer, or institution. No part of such lump sum appropriation may be expended unless and until such budget schedule is approved by the Board of Public Works.

We find that item 32.01.05.03 is not a lump sum within the purview of § 12. The mere fact that the budget item, itself, does not identify the myriad of services and procedures for which providers are entitled to reimbursement does not convert the appropriation into a lump sum. In any event, the question is moot for reasons previously set forth.

---

cally necessary because there is substantial risk that continuation of the pregnancy could have a serious and adverse effect on the woman's present or future physical health;

or before an abortion can be performed on the grounds of mental health there must be certification in writing by the physician or surgeon that in his or her professional judgment there exists medical evidence that continuation of the pregnancy is creating a serious effect on the woman's present mental health and if carried to term there is substantial risk of a serious or long lasting effect on the woman's future mental health; and to the extent that such provisions are unconstitutional or impermissible under applicable Federal law pursuant to decisions of the United States Supreme Court they shall not apply.

## IV

Finally, appellants contend that prior to January 11, 1978, the Appellee, Secretary of Health and Mental Hygiene, illegally expended funds for abortions because prior to that date the Secretary's own regulations were not adequate to permit such funding. They also contend that regulations thereafter adopted were void in that they impermissibly delegated to a private citizen (the physician) the right to determine his own eligibility to claim public funds.[8]

Appellant's contention with regard to funds expended prior to January 11, 1978, is clearly moot. Nor does their second argument require substantial analysis. Each year since 1978, the Secretary of Health and Mental Hygiene has adopted regulations to reflect the restrictions on abortion funding contained in the yearly budget bill. In general these regulations require that the physician certify that one of the specified conditions exist. This procedure, say appellants, impermissibly delegates to the physician the power to determine his own eligibility for public funding.

The short answer to appellants' contention is that the budget bill enacted by the legislature expressly requires that the decision be a professional judgment on the part of the physician. Necessarily, we find the regulations consistent with the budget bill. Appellants' view that leaving the judgment in this matter to the financially interested treating physician is impermissible is peculiarly inconsistent with society's notions of the responsibilities of the medical profession. Generally, doctors are encouraged by society's expectations, by the strictures of malpractice law and by their own professional standards to give their patients such treatment as is appropriate. Moreover, if the physician fraudulently abuses his responsibility, there are administrative, judicial, and intra-professional remedies available. *See* C.O.M.A.R. 10.09.02.09. Indeed, whether a particular operation is indicated is a judgment that physicians are

---

8. The current regulation, C.O.M.A.R. 10.09.02.04G, may be found at 7 Md. Reg. 1588-89 (August 8, 1980).

obviously called upon to make routinely whenever non-emergency surgery is considered.

For the foregoing reasons, the court below was correct in denying the appellants the relief requested.

*Judgment of the Circuit Court for Anne Arundel County affirmed; appellants to pay the costs.*