Dear Honorable John F. Fader, II
You have asked for our opinion concerning the legality of a "surrogate adoption" in Maryland when a fee is paid to the birth mother.[1] A surrogate adoption involves an adoption by one or both members of a couple of a child born pursuant to a "surrogacy contract" with the birth mother.
In our opinion, surrogacy contracts that involve the payment of a fee to the birth mother are, in most instances, illegal and unenforceable under Maryland law. However, the decision whether to grant an adoption petition turns on the best interests of the child. In the context of a "surrogate adoption," a court may consider the payment of a surrogacy fee to the extent that it bears on that issue or on related issues such as the voluntariness of the birth mother's consent to the adoption. The payment of a surrogacy fee does not by itself bar approval of an adoption petition.
 I Surrogacy Contracts
Under what has come to be known as a "surrogacy contract," a woman agrees to bear a child and then surrender that child to the other parties to the contract in return for certain payments and other promises. Under a "traditional" surrogacy agreement, the surrogate mother is artificially inseminated with the sperm of the intended father, carries the child to term, and relinquishes parental rights after birth. The father acknowledges paternity and takes custody of the child; his spouse then typically adopts the child.[2] In re Marriage of Moschetta,30 Cal.Rptr.2d 893, 894 (Cal.Ct.App. 1994); 46 Or. Op. Atty. Gen. 221 (1989), 1989 WL 439814.
In addition to the basic agreement that the surrogate mother will become pregnant, carry the child to term, and take all actions necessary to transfer physical and legal custody to the intended parents, a surrogacy contract may also impose other obligations on the woman. For example, the contract may require that the surrogate mother follow the medical directions of clinic personnel, submit to medical testing, abstain from alcohol, tobacco, or other drugs, and refrain from sexual relations around the time that fertilization or implantation is attempted. Mark A. Johnson, Some Observations Concerning the Law ofSurrogacy (April 1996), http://www.surrogacy.com/legals/article/checklist/chklst1.html. In addition, a surrogacy contract may prohibit the woman from having an abortion, unless necessary to save the life of the surrogate mother or "the child has been determined to suffer from genetic or physical abnormalities." Id., sample contract at § 7. Some contracts require that amniocentesis be performed and provide that the surrogate mother will be solely liable for the child's care if she does not abort a fetus found to suffer from a physiological abnormality. See Memorandum Opinion in Support of Recommendation of Master, Ex Parte in the Matter of thePetition for the Adoption of a Minor Child, No. 90 AD 1602 (Circuit Court for Howard County, June 10, 1992) at p. 5. A contract may also require caesarean delivery. See Johnson, supra.
In return, the other parties to the contract — i.e., the intended parents — ordinarily agree to make payments to the birth mother at prescribed times and to assume custody and all financial responsibility for the child regardless of the child's physical or mental condition. Johnson, supra.
 II Analysis
A. Maryland Statutes
Two criminal provisions of Maryland law potentially forbid the payment of a fee in connection with a surrogacy agreement. One bans the payment of compensation in connection with an adoption. The other outlaws child-selling. The Legislature has also made several attempts during the past two decades to specifically address surrogacy contracts without success.
1. Ban on Compensation Related to Adoption — FL § 5-327(a)
The State adoption law contains an explicit prohibition against the payment of compensation to either the birth parents (termed in the law "natural parents") or the adoptive parents. It provides:
 (1) Except as otherwise provided, an agency, institution, or individual who renders any service in connection with the placement of an individual for adoption, or in connection with an agreement for the custody of an individual in contemplation of adoption, may not charge or receive from or on behalf of either the natural parent of the individual to be adopted, or from or on behalf of the individual who is adopting the individual, any compensation for the placement or agreement.
 (2) This subsection does not prohibit the payment, by any interested person, of reasonable and customary charges or fees for hospital or medical or legal services.
Annotated Code of Maryland, Family Law Article ("FL"), § 5-327(a). To aid in the enforcement of this provision, a petitioner in an independent adoption is required to file an accounting of all payments made in connection with the adoption. FL § 5-327(c). Violation of the requirements of FL § 5-327 is a misdemeanor punishable by imprisonment for up to three months and a fine of up to $100. FL § 5-327(e).
This prohibition against the payment of compensation in connection with an adoption was originally enacted as part of a comprehensive revision of the adoption laws in the late 1940s. Chapter 599, Laws of Maryland 1947. The Report of the Commission to Study Revision of Adoption Laws of the State of Maryland (1946) states that the provision was intended "to prevent the barter of children, [by prohibiting] the taking of compensation by anyone for the placement of a child."
Surrogacy contracts, as outlined above, did not exist at the time the predecessor of FL § 5-327 was enacted in 1947. With the advent of medical technology that gave rise to surrogacy contracts, there was some question as to the applicability of FL § 5-327 to such transactions. Of course, a broad general law does not apply solely to activities that were technologically possible at the time of its enactment. Kindley v.Governor, 289 Md. 620, 624-625, 426 A.2d 908 (1981). However, surrogacy agreements presented some unique issues.
A 1983 State study concluded that a surrogacy agreement that did not include adoption as part of the services compensated under the agreement would not violate FL § 5-327, but could violate "the common law prohibition against baby selling." Office for Children and Youth, Reportof the Committee to Study Surrogate Mother Programs (February 1983) at pp. 5-8.[3] A 1988 law review article suggested that FL § 5-327 would likely invalidate most surrogacy agreements, since the statute was apparently designed to discourage contracts arranged by third-party intermediaries such as surrogate placement agencies. See Comment,Regulatory Options for Surrogate Arrangements in Maryland, 18 U.Balt. L.Rev. 110, 119-21 (1988). On the other hand, the article suggested, the statute might be inapplicable to surrogacy contracts because its overriding objective was to regulate arrangements between the mother of a child and strangers while a traditional surrogacy agreement is between parents and concerns support and custody of the child.[4]Id.
In 1992, the Legislature added the prohibition on payments "in connection with an agreement for the custody of an individual in contemplation of adoption," extended the statute of limitations from the general one-year period for misdemeanors to three years, and added the requirement for an accounting of payments made in connection with an independent adoption. Chapters 267, 446, Laws of Maryland 1992. Those amendments were designed to ensure that the statute applied to certain surrogacy agreements that might otherwise fall outside its purview, according to testimony by the sponsor of those bills and by the domestic relations master of the Howard County Circuit Court before the Legislature. Audio tape of Hearing before Senate Judicial Proceedings Committee on Senate Bills 622, 623 (March 5, 1992). For example, many surrogacy contracts involve the payment of consideration in return for an agreement on custody, presumably in anticipation of an adoption. Id.[5]
 2. Prohibition Against Child-Selling — Article 27, § 35E
The State criminal code generally forbids child-selling:
 A person may not sell, barter, or trade, or offer to sell, barter, or trade a child for money or property, either real or personal, or anything else of value.
Annotated Code of Maryland, Article 27, § 35E(a). Violation of this provision is a misdemeanor, punishable by imprisonment for up to five years and a fine of up to $10,000. Article 27, § 35E(b).
This provision was enacted in 1989 when two well-publicized cases raised a concern that some forms of baby-selling were not proscribed by FL § 5-327.[6] Chapter 300, Laws of Maryland 1989. The legislative history of Article 27, § 35E reflects no explicit discussion of surrogacy agreements. See State v. Runkles, 326 Md. 384, 398-400,605 A.2d 111 (1992) (summarizing legislative history of statute).
3. Failed Legislative Attempts to Permit or to Ban Surrogacy Contracts
During a ten-year period from the mid-1980s through the mid-1990s, numerous bills explicitly addressing surrogacy contracts were introduced into the General Assembly. Several bills that would have expressly permitted and regulated surrogacy failed when they received unfavorable recommendations from the House Judiciary Committee.[7] Similarly, numerous bills that would have explicitly prohibited surrogacy contracts also failed when they did not pass both houses of the Legislature.[8]
Finally, in 1992, the Legislature passed a bill that would have added a section to the Family Law Article that provided simply that "[a] surrogate parentage contract is void and unenforceable as against State policy." Senate Bill 251 (1992). However, the Governor vetoed the bill. Laws of Maryland 1992 at pp. 4172-75. Two years later, the Legislature passed an identical bill[9] — Senate Bill 171 (1994) — but the Governor again vetoed the bill. Laws of Maryland 1994 at pp. 3471-72.
In his 1992 veto message, then Governor Schaefer stated that his decision was based in part on advice from this Office that a Maryland court would likely hold that a surrogacy contract was unenforceable under existing law[10]; accordingly, the Governor reasoned, it was unclear what effect the bill would have. In addition, in both veto messages, Governor Schaefer expressed his own opinion that a surrogacy contract was a personal matter that should be left to the individuals involved.
The Court of Appeals has often admonished that the failure of a bill in the Legislature is "a rather weak reed upon which to lean in ascertaining legislative intent." See, e.g., Goldstein v. State, 339 Md. 563, 569-70,664 A.2d 375 (1995). That maxim is particularly apt when the Legislature has rejected proposals both to permit surrogacy and to explicitly prohibit it, sometimes during the same session. Thus, despite repeated efforts by the Legislature to address surrogacy contracts, that activity sheds little light on the status of surrogacy contracts under the existing State law. At best, it can be said that on two occasions a majority of both houses of the Legislature declared such contracts void and unenforceable and that those bills were vetoed in part on the premise that surrogacy contracts were already unenforceable under existing Maryland law.
B. Maryland Case Law
 1. Appellate Decisions Construing FL § 5-327 andArticle 27, § 35E
No Maryland appellate decision applies FL § 5-327 or Article 27, § 35E, in the context of a surrogacy contract. However, in other contexts, the Court of Appeals has broadly construed the prohibitions against child-selling and compensation in connection with an adoption. Of particular relevance to surrogacy contracts, the Court has held that those statutes reach transactions between relatives of a child and agreements concerning custody as well as adoption.
In a case arising out of an adoption proceeding, the Court held that FL § 5-327 barred payments made by the adopting parents directly to the birth mother to cover the cost of maternity clothes. In re Adoption No.
9979, 323 Md. 39, 591 A.2d 468 (1991).[11] The Court also indicated that the circuit court could appropriately consider a violation of FL § 5-327(a) in determining whether to grant the adoption, as illegal payments could bear on the voluntariness of the birth mother's consent and on the fitness of the adopting parents. 323 Md. at 51. However, while noting that FL § 5-327 is a penal statute that should ordinarily be enforced by criminal proceedings, the Court did not reach the issue of whether the statute would support ancillary civil relief in an adoption action.
In the context of a child support enforcement proceeding, the Court held that the child-selling statute and the adoption compensation ban evinced a State policy forbidding payments of compensation to a natural parent in exchange for that parent's consent to an adoption. Stambaugh v.Child Support Enforcement Administration, 323 Md. 106, 591 A.2d 501
(1991). That case involved an agreement between a divorced couple under which the ex-husband consented to the adoption of the couple's children by the wife's new husband in exchange for the ex-wife's waiver of child support that was in arrears. Citing both FL § 5-327 and Article 27, § 35E, the Court held that the agreement was void as contrary to public policy.
In a criminal prosecution under Article 27, § 35E, the Court held that the statute was not limited to payments connected with an adoption, but also included the relinquishment of the custody of a child in exchange for money. State v. Runkles, 326 Md. 384,605 A.2d 111 (1992). In that case, the boyfriend of the mother of a child approached the child's grandfather and offered, in return for $4,000, to persuade the mother to grant custody of the child to the grandfather.
These decisions make clear that FL § 5-327 and Article 27, § 35E
apply to payments made directly to the natural parent of a child. Moreover, as both Stambaugh and Runkles illustrate, those statutes apply even if one of the persons receiving the child is a relative or a natural parent of the child. Finally, as Runkles indicates, the proscription against baby selling reaches agreements that contemplate only a change in the custody of the child. These decisions suggest that payments made as part of a surrogacy agreement violate the Maryland statutes prohibiting child-selling and the payment of compensation in connection with an adoption.
2. Circuit Court Decisions on Surrogacy Agreements
While the Maryland appellate courts have not construed the adoption compensation ban or the child-selling statute in the context of a surrogacy agreement, three written opinions in adoption proceedings in the circuit courts have analyzed that issue in some detail. Opinions in two cases in the Howard County Circuit Court concluded that surrogacy agreements involving payments of compensation are illegal under Maryland law. A decision of the Montgomery County Circuit Court also questioned the legality of surrogacy contracts, but concluded that a successful criminal prosecution was unlikely and declined to declare such contracts illegal. All three opinions concluded that the decision whether surrogacy contracts violate the public policy of the State is a matter for the Legislature. Finally, all three decisions also approved the adoption at issue. Thus, while those decisions took somewhat different paths, they reached similar results.
Howard County cases
In the two Howard County cases, the circuit court's domestic relations master discussed the application of the baby selling statutes in memorandum opinions in support of recommendations in adoption proceedings that arose from surrogacy contracts. Ex Parte in the Matter of thePetition for the Adoption of a Minor Child, 90-AD-1602 (Circuit Court for Howard County (June 10, 1992) (Bernard Raum, Master); Ex Parte in theMatter of the Petition for the Adoption of a Minor Child, 91-AD-1681 (Circuit Court for Howard County, (June 19, 1992) (Bernard Raum, Master).
In each case, the master considered: (1) whether the petition for adoption should be dismissed based on violations of FL § 5-327 and Article 27, § 35E, and (2) whether surrogate adoptions are against the public policy of the State.[12] Relying on Runkles, the master concluded that surrogacy contracts that involve payments related to an agreement on custody of a child violate § 35E. In one of the cases, he noted that the final payment under the contract was to be made after the surrogate mother relinquished the baby to the father, and that the surrogate and her husband expressly agreed in the contract not to establish a parental relationship with the child.[13]
With respect to FL § 5-327, the master concluded in both cases that it was "virtually impossible not to arrive at the conclusion that the entire enterprise was in contemplation of and in furtherance of an adoption." The master particularly relied on testimony that reflected that the parties contemplated adoption when they entered into the agreements, and on contract provisions requiring the surrogate mother and her husband to take all steps necessary to terminate their parental rights to the child. Citing Stambaugh and In re Adoption 9979, the master concluded that the payments under the contracts violated FL § 5-327.[14]
In each case, the master also addressed the question whether surrogate adoptions are against the public policy of the State. After briefly recounting some of the legislative attempts to address surrogacy contracts, the master concluded that the public policy on the general subject of surrogacy contracts was in a "state of turmoil," and was best left to the Legislature. Nonetheless, he reiterated that surrogacy contracts that contemplate adoption or a relinquishment of custody and that involve "component payments" are prohibited by FL § 5-327 and Article 27, § 35E, and are therefore unenforceable under Maryland law.
Finally, the master considered how these conclusions should affect the decision on the adoption petitions in the particular cases at hand. While reiterating that surrogacy agreements involving payments are unenforceable because they violate the child-selling statutes, the master noted that the two statutes provide only criminal penalties and do not specify any civil penalty or disability that would require dismissal of an adoption petition. Because each adoption proceeding concerned the status of a child and not enforcement of a contract, the master concluded that those proceedings were not the proper forum in which to address the statutory violations, except to the extent that the violations related to the best interests of the child. Finding in each case that the adoption was in the best interests of the child, he recommended that the adoptions be granted.
Montgomery County case
Like the Howard County cases, the Montgomery County case was an adoption proceeding that involved a child born as a result of a surrogacy agreement. Opinion in Ex Parte in the Matter of M.S.M. and G.M. for theAdoption of a Minor Infant, Adoption No. 11171 (Circuit Court for Montgomery County, August 20, 1993) (Peter J. Messitte, Circuit Judge) ("Circuit Court Opinion"). The circuit court noted that all parties agreed to the adoption and that the adoptive mother appeared to be a fit parent. However, the court construed the requirement of an accounting of adoption-related expenses under FL § 5-327(c) to require it "to review the propriety of adoption-related expenses prior to the entry of a final decree" of adoption. Circuit Court Opinion at p. 1. Accordingly, the court addressed the legality of the payment of $15,000 to the surrogate mother under the contract.
The circuit court first acknowledged that a typical surrogacy contract would appear to violate FL § 5-327 and Article 27, § 35E, and would likely be unenforceable in a Maryland court. The court canvassed law review articles and case law from other states and listed arguments for and against application of similar statutes to surrogacy contracts.[15] The court noted that opinion was divided over whether statutes on baby-selling prohibit the payment of a fee to a surrogate mother, but concluded that the argument that a surrogate mother is paid for services "seems implausible," and that "it is compelling to argue that this is payment for a child." Circuit Court Opinion at p. 8. However, the court stated that "logic is one thing, experience another matter altogether," and observed that, because these statutes contain only criminal remedies, a violation would be contingent upon proof beyond a reasonable doubt that a person acted with criminal intent. Thus, the circuit court concluded:
 Given the history and current status of surrogacy parenting contracts both in and outside of Maryland, the Court is of the view that it would be virtually impossible for any criminal prosecution of parties to a surrogacy contract to succeed in this State under the referenced statutes. It is equally doubtful that a court in an adoption proceeding could fairly conclude that surrogacy parenting contracts otherwise violate Maryland's public policy in the precise sense that case law defines the term. In short, as matters stand, the Court can only conclude that such contracts are not illegal in this state.
Id. at p. 9. After deciding that the surrogacy contract did not violate the statutes beyond a reasonable doubt, and that the public policy in Maryland was otherwise unclear, the circuit court entered a decree of adoption.
C. Surrogacy Contracts in Other States
A number of states have addressed surrogacy agreements explicitly in legislation. Some statutes declare surrogacy contracts illegal and unenforceable or criminalize the practice; in other states, legislation declares such contracts legal but unenforceable; in another variation, some statutes make the contracts unenforceable only if the surrogate is to be compensated or legalize those contracts that do not involve such compensation; in a few states, legislation permits and regulates the practice. See R.R. v. M.H., 689 N.E.2d 790, 793-94 (Mass. 1998) (summarizing statutes in 18 states and District of Columbia); Comment,Legislating Surrogacy: A Partial Answer to Feminist Criticism,
54 Md. L.Rev. 488, 504-8 (1995).
Most pertinent to the status of surrogacy contracts under Maryland law are cases from other states that address the application to surrogacy contracts of statutes like FL § 5-327 that bar payments in connection with adoption.[16] See Annotation, 77 ALR 4th 70 (collecting cases). To the extent that a majority rule can be gleaned from these cases, most courts apparently hold that payments under surrogacy agreements are consideration for the provision of a baby for adoption and not simply for the services of the mother in bearing that child.[17] Thus, many cases find that payments violate the law, or at least the public policy reflected in the law. A minority of cases finds significance in the usual timing of a surrogacy agreement — i.e., before the birth or even the conception of the child — and the absence of explicit provisions concerning adoption in an agreement. While these disparate holdings are attributable in some instances to differences in statutory law,[18] they also reflect the absence of a consensus about the desirability and appropriateness of surrogacy arrangements.
In any event, in cases involving a proposed adoption in which the parties are in agreement, the courts generally approve the adoption as in the best interests of the child, despite the violation. Only a few cases have found that a payment renders the birth mother's consent invalid so that the adoption may not take place in the absence of a finding that the birth mother is unfit to be a parent.[19]
In the earliest reported case, a Michigan couple that had entered into a surrogacy contract with the secretary of the husband challenged the constitutionality of Michigan statutes similar to FL § 5-327 that prohibited compensation in connection with an adoption. The Michigan Court of Appeals assumed that those statutes would bar payments to the surrogate mother, and held that the application of the statutes to payments under a surrogacy contract did not violate a constitutional right of privacy. Doe v. Kelley, 307 N.W.2d 438 (Mich.App. 1981), cert.denied, 459 U.S. 1183 (1983). See also Doe v. Attorney General,487 N.W.2d 484 (Mich.App. 1992) (upholding a later Michigan statute prohibiting surrogacy contracts for compensation).
In Surrogate Parenting Associates, Inc. v. Kentucky, 704 S.W.2d 209
(Ky. 1986), the Kentucky Attorney General sought to revoke the corporate charter of an agency that arranged surrogacy contracts. The Attorney General argued that surrogacy contracts arranged by the company violated Kentucky statutes that barred the sale of a child for purposes of adoption and that invalidated a mother's consent to adoption prior to the birth of a child.[20] However, the Kentucky Supreme Court held that fundamental differences between traditional surrogacy contracts and the practices that were the focus of the baby-selling laws took surrogacy contracts outside the scope of those laws.
Specifically, the Kentucky court found that the baby-selling laws were designed to prevent baby brokers from using financial incentives to induce an expectant mother, or the parents of a child, to part with the child. By contrast, it reasoned, surrogacy arrangements are made prior to the conception of the child; the prospective birth mother is thus not concerned about the results of an unwanted pregnancy or the financial burden of raising a child, but with assisting an infertile couple. Seealso Johnson v. Calvert, 851 P.2d 776 (Cal.), cert. denied, 510 U.S. 874
(1993) (because the agreement preceded conception, the surrogate "was not vulnerable to financial inducements to part with her own expected offspring"). However, the court also recognized that the birth mother's agreement to consent to adoption, made prior to the birth of the child, was invalid under Kentucky law. Accordingly, the court held that the surrogacy contracts were voidable by the surrogate mother, but not void.See also Matter of Adoption of Baby Girl L.J., 505 N.Y.S.2d 813
(N.Y.Sur.Ct. 1986) (reaching similar conclusion under New York law).[21]
When a surrogate mother refuses to relinquish her parental rights and consent to an adoption or custody by the father, courts generally refuse to enforce the surrogacy agreement. In a highly publicized New Jersey case, the birth mother refused to carry out her contractual obligation to terminate her maternal rights or to surrender custody of the child. Inthe Matter of Baby M, 537 A.2d 1227 (N.J. 1988). In that case, the New Jersey Supreme Court concluded that, despite contract language that portrayed the surrogacy fee as compensation for "personal services" of the birth mother, the fee was, in reality, compensation for a private placement adoption. Accordingly, the contract violated a New Jersey law prohibiting payments in connection with adoption. The court also expressed doubt that the fact that the agreement preceded conception eliminated the possibility of the type of overreaching that laws against baby-selling were designed to prevent. Moreover, the court stated that the policy underlying baby-selling statutes went beyond the protection of expectant mothers and families from overreaching, noting that surrogacy contracts do not consider the best interests of the child or whether the purchasers are suitable parents. As a result, the court found that the agreement was void and refused to enforce it or to terminate the birth mother's parental rights. Applying the "best interests of the child" standard, the court awarded custody to the father, but granted visitation rights to the birth mother.
In a recent case, the Massachusetts Supreme Judicial Court held that a traditional surrogacy agreement was not enforceable against a surrogate who had changed her mind. R.R. v. M.H., 689 N.E.2d 790 (Mass. 1998). The court concluded that the policies underlying the adoption laws required that a surrogacy agreement be given no effect, if the birth mother consented to relinquish custody before the child's birth or if her agreement was induced by the payment of money. Moreover, the court rejected the argument that the payments made to the birth mother were for services rather than for the child, where the contract provided that the surrogate would surrender custody to the father or forfeit all payments. Similarly, the court found little merit in distinctions based on the timing of the agreement:
 Eliminating any financial reward to a surrogate mother is the only way to assure that no economic pressure will cause a woman, who may well be a member of an economically vulnerable class, to act as a surrogate. It is true that a surrogate enters into the agreement before she becomes pregnant and thus is not presented with the desperation that a poor unwed pregnant woman may confront. However, compensated surrogacy arrangements raise the concern that, under financial pressure, a woman will permit her body to be used and her child to be given away.
 689 N.E.2d at 796. The court suggested that a surrogacy agreement might be enforceable if there were no payment of compensation to the birth mother and if she were not bound by her consent to the father's custody of the child until a "suitable period" after the birth. Id. at 797. Nevertheless, the court cautioned that the parties could not by private agreement make a binding determination of the "best interests of the child" for purposes of custody.
D. Summary
In FL § 5-327, Maryland's adoption law clearly prohibits not only the payment of compensation in connection with an adoption but also payments in contemplation of an adoption — a provision added to the statute with surrogacy agreements in mind. In Article 27, § 35E, the State criminal law broadly forbids various forms of child-selling. Moreover, as construed by the Court of Appeals, § 35E pertains to changes in custody as well as to adoptions, and both statutes reach agreements involving consideration passing between relatives of the child.
In our view, the argument that payments made under a surrogacy contract are not in connection with the adoption or custody of the child, but rather for the "services" of the birth mother, is unrealistic. This is especially so when the contract requires the birth mother not only to transfer custody, but to take all steps necessary to relinquish parental rights. The underlying purpose of a traditional surrogacy contract is not simply to engage the birth mother's services to add another individual to the population of the world. Rather, the object is for the prospective parents to obtain custody and parental rights with respect to a child that may be genetically related to one or both of them.
Nor are surrogacy arrangements free of the concerns that inspired the laws against child-selling. As noted in R.H. and Baby M, the financial distress that would impel a woman to undertake a pregnancy with the intention of giving up the child is likely to be as severe as the straitened circumstances that would induce an expectant mother, or a family with a new baby, to sell a child. Moreover, as noted in Baby M,
the effect of provisions in many surrogacy contracts is to determine custody of a child without reference to the fitness of the parents or the best interests of the child. Thus, in our opinion, payments with respect to traditional surrogacy contracts would violate both Maryland statutes in most circumstances, and such contracts are unenforceable under Maryland law.[22]
The consequences of such a violation in an adoption proceeding are less straightforward. In Adoption No. 9979, the Court of Appeals noted that penal statutes like FL § 5-327 and Article 27, § 35E, are ordinarily enforced through criminal proceedings. While the Court did not rule out enforcement as part of an adoption proceeding, it did express significant caution about the idea) caution that was adopted by the circuit court in Montgomery County and the master in Howard County. Moreover, while the General Assembly later amended FL § 5-327, apparently in reaction to Adoption No. 9979, to require an accounting of payments as a part of the adoption process, it did not specifically authorize a court to deny an adoption petition based on such payments.[23]
The Court of Appeals has made clear that "the controlling factor in adoption and custody cases is . . . what best serves the interest of the child." In re Adoption/Guardianship No. 10941, 335 Md. 99, 113,642 A.2d 201 (1994). Invalid payments may be a factor that bears on the voluntariness of consent of the birth mother to the adoption, or on the fitness of the adoptive parents, but the legislation does not make the invalidity of the payments conclusive on those issues. Thus, in our opinion, while a Maryland court appropriately may consider any such payments in deciding whether to approve an adoption, the ultimate criterion remains the best interests of the child.
 III Conclusion
In our opinion, surrogacy contracts that involve the payment of a fee to the birth mother are, in most instances, illegal and unenforceable under Maryland law. However, the decision whether to grant an adoption petition turns on the best interests of the child. In the context of a "surrogate adoption," a court may consider the payment of a surrogacy fee to the extent that it bears on that issue or on related issues such as the voluntariness of the birth mother's consent to the adoption. The payment of a surrogacy fee does not by itself bar approval of an adoption petition.
 J. Joseph Curran, Jr. Attorney General
 Kathryn M. Rowe Assistant Attorney General
 Robert N. McDonald Chief Counsel Opinions Advice
[1] You indicate that your interest in this question has been prompted by an adoption proceeding that you have under advisement. This opinion addresses only the legal question you have posed. We express no opinion on the merits of the adoption petition in the case before you.
[2] In a variation called a "gestational surrogacy contract," the woman is impregnated with a fertilized embryo, which may be the result of invitro fertilization of the egg of the intended mother with the sperm of the intended father. See, e.g., Johnson v. Calvert, 851 P.2d 776, 778
(Cal.), cert. denied, 510 U.S. 874 (1993); Soos v. Superior Court,897 P.2d 1356 (Ariz.Ct.App. 1994); Belsito v. Clark, 644 N.E.2d 760 (Ohio Ct.Com.Pl. 1994). In those circumstances, both of the prospective parents may be genetically related to the child, while the surrogate mother provides only a "host uterus." Soos, supra, at 472 n. 1.
In another variation, a gestational surrogacy contract may involve a sperm and an egg from anonymous donors, with the result that the child has no genetic relation to either the birth mother or the intended parents.In re Marriage of Buzzanca, 72 Cal.Rptr.2d 280 (Cal.Ct.App. 1998); JayceeB. v. Superior Court, 49 Cal.Rptr.2d 694, 695 (Cal.Ct.App. 1996).
[3] In fact, it is unlikely that there was a common law rule against baby-selling. Blackstone not only mentions no such crime, he notes that the Romans had the power of life or death over their children and that, while the power of English parents was less extensive, it was still substantial. 1 Blackstone, Commentaries 452. Pollock and Maitland note that in the seventh century even the church was compelled to allow that, in a case of necessity, an English father might sell into slavery a son who was not yet seven years old, though an older boy could not be sold without his consent. Pollock and Maitland, History of the English Law
VII, § 3 (Cambridge University Press 1968). Moreover, the history of adoption laws in America reflects that limitations on payment were adopted only after years of outrage over abuses. Hollinger, Adoption Lawand Practice, §§ 1.03, 1.04.
[4] The Court of Appeals later held that the statute pertained to transactions between relatives of a child. See Part II.B.1. of this opinion.
[5] Other amendments to the statute have been minor. For example, in 1970, the General Assembly exempted certain payments made to licensed adoption agencies or institutions. Chapter 648, Laws of Maryland 1970;see In re Adoption No. 9979, 323 Md. 39, 43-44, 591 A.2d 468
(1991).
[6] In one case, a Pennsylvania couple ran an advertisement in a Baltimore area magazine offering their child for sale. Undercover Maryland State Police officers, working with Pennsylvania authorities, agreed to buy the baby for $30,000. Although the parents were prosecuted in Pennsylvania, the case raised concerns that FL § 5-327 would not have supported a prosecution in Maryland. In the second case, a mother in Anne Arundel County allegedly sold her child for cocaine and cash. The circuit court held that the mother could not be prosecuted under FL § 5-327 for the sale of the baby. That decision "apparently furnished additional impetus" for the enactment of § 35E. See In re AdoptionNo. 9979, 323 Md. 39, 47-48, 591 A.2d 468 (1991).
[7] See House Bill 1595 (1984); House Bill 1552 (1985); House Bill 759 (1987); House Bill 649 (1988). In addition, a 1988 bill, which would have allowed the payment of some expenses of the natural mother of a child to be adopted, was amended to bar an agreement to pay such expenses if the agreement was made prior to the pregnancy. Senate Bill 436 (1988). That bill also failed.
[8] See, e.g., Senate Bill 613 (1987) ("[a] person may not be a party to an agreement in which a woman agrees to conceive a child through artificial insemination and to voluntarily relinquish her parental rights"); Senate Bill 795 (1988) (same); House Bill 1479 (1988) (surrogacy agreements unenforceable and void as against public policy); Senate Bill 477 (1989) (same); House Bill 1340 (1989) (voiding agreements with provisions commonly found in surrogacy contracts). See also House Bill 1489 (1990); Senate Bill 228 (1990); Senate Bill 322 (1991); Senate Bill 639 (1992).
[9] An identical bill submitted in 1993 had died in committee. Senate Bill 369 (1993). Since the 1994 veto, only one bill has been introduced that dealt expressly with surrogacy, and it failed. Senate Bill 39 (1995).
[10] See Letter of Assistant Attorney General Kathryn M. Rowe to Delegate Barbara O. Kreamer (February 27, 1989) (concluding that surrogacy contracts were of doubtful validity in light of FL § 5-327
and would be unenforceable if surrogate changed her mind because enforcement would conflict with statutes concerning the timing of the consent to adoption and the termination of parental rights); Letter of Assistant Attorney General Kathryn M. Rowe to Senator Norman R. Stone (March 1, 1991) (concluding that passage of Article 27, § 35E
rendered the validity of surrogacy contracts even more questionable).
[11] The Court stated:
 Describing a natural parent who signs a consent form and turns over a child for adoption as one who "renders any service in connection with the placement of a [child]," may not be the warmest possible prose, but it literally does include the natural parents. Indeed, it might be difficult to think of anyone capable of performing a greater "service in connection with the placement" than the natural parents.
323 Md. at 44.
[12] Each case also involved certain related issues. In one case, the petitioner contended that the adoption proceeding was a step-parent adoption. However, the master concluded that, given the statutory presumption that the child was the offspring of the birth mother and her husband, the proceeding could not properly be characterized as a step-parent adoption.
In the other case, the petitioners challenged on constitutional grounds the application of FL § 5-327 and Article 27, § 35E to block a surrogate adoption. They also challenged on constitutional grounds the application of the statutory presumption of paternity in favor of the birth mother's husband, when there is no similar presumption of maternity in favor of the wife of the man who furnished the sperm that resulted in the child. The master rejected those constitutional arguments.
[13] In the other case, the master concluded that § 35E did not apply, as the relevant events preceded the effective date of that statute.
[14] In each case, the master stated in a footnote that the prohibition of FL § 5-327 would "apply equally to out-of-state agreements which have as their intended consequences an adoption proceeding in Maryland."
[15] The circuit court summarized:
 Among the arguments made in favor of the applicability of the statutes are that:
(1) surrogacy agreements constitute baby-selling;
 (2) they dehumanize and exploit women, especially women of lower economic standing;
 (3) they focus exclusively on the parents' desires instead of the child's best interests.
Opposed to this it is argued that:
 (1) surrogacy contracts are primarily for "services" and only incidentally for the delivery of a child;
 (2) the prohibitive legislation does not expressly foreclose the use of surrogate mothers or the paying of compensation to them;
 (3) surrogacy is different from adoption because the father is biologically related to the child;
(4) surrogacy is like artificial insemination;
 (5) such contracts do not exploit women because they are entered into voluntarily before conception when the mother is not under pressure to give up the child;
 (6) any limitation on surrogacy agreements violates the constitutional right to privacy;
 (7) there are fewer children available for adoption than before; surrogacy may be the only way for some couples to have their own children.
Circuit Court Opinion at pp. 6-8 (citations omitted).
[16] Few states apparently have child-selling prohibitions as broad as Article 27, § 35E, that have been construed in this context.
[17] Some courts have held that adoption laws do not apply to "gestational" surrogacy agreements, as described in footnote 2 above. For example, the California Supreme Court held that "gestational surrogacy" differs in "crucial respects" from adoption and is not subject to the adoption statutes because "the surrogate in a gestational surrogacy arrangement is not the genetic mother of the child." Johnson v. Calvert,851 P.2d 776 (Cal.), cert. denied, 510 U.S. 874 (1993). See also In reMarriage of Buzzanca, 72 Cal.Rptr.2d 280, 289 (Cal.Ct.App. 1998); Belsitov. Clark, 644 N.E.2d 760, 766-67 (Ohio Ct.Com.Pl. 1994).
In a case involving a "traditional" surrogacy contract, the California intermediate appellate court distinguished Johnson on the ground that the birth mother was genetically related to the child, and concluded that the state's adoption laws applied. See In re Marriage of Moschetta,30 Cal.Rptr. 893 (Cal.Ct.App. 1994).
[18] For example, in some jurisdictions, statutes that forbid baby selling have an exception for payments between the parents of a child — an exception that is pertinent in the context of a typical surrogacy contract, under which a male party to the contract will be the child's biological parent. See Wash. AGO 1989 No. 4, 1989 WL 438954
(payment to surrogate mother is not barred by Washington statute that expressly exempts payments between the parents of the child).
[19] See In the Matter of the Adoption of Paul, 550 N.Y.S.2d 815
(N.Y.Fam.Ct. 1990) (refusing to find birth mother's surrender of child voluntary, unless she stated under oath that she "has not and will not request, accept, or receive the $10,000 promised to her in exchange for surrender of her child"); Anonymous v. Anonymous, 1991 WL 228555
(N.Y.Fam.Ct. 1991) (refusing to take jurisdiction of a filiation petition arising from a surrogacy contract on the ground that it would "contravene New York's well-established policy forbidding the exchange of cash or other compensation in transactions involving the status of children").
[20] That action was initiated shortly after the Kentucky Attorney General issued an opinion that surrogacy contracts were illegal and unenforceable under Kentucky law. 1980-81 Ky. Op. Atty. Gen. 2-588 (Opinion No. 81-18), 1981 WL 142305. Similarly, most opinions of state Attorneys General on this subject have concluded that surrogacy arrangements involving a fee violate statutory bans on baby-selling or the payment of compensation in connection with an adoption. See, e.g.,
Kan. Atty. Gen. Op. No. 96-73 (1996), 1996 WL 563344 (concluding that payment to a surrogate mother is not payment for "services" permitted as an exception to statutory ban on consideration in connection with an adoption); 46 Or. Op. Atty. Gen. 221 (1989), 1989 WL 439814; La. Atty. Gen. Op. No. 83-869 (1983), 1983 WL 177217; 15 Okla. Op. Atty. Gen. 277 (Opinion No. 96-73, 1983), 1983 WL 174961.
[21] The holdings in both Surrogate Parenting Associates and Baby GirlL.J. were later effectively overruled by the Kentucky and New York legislatures, respectively. See R.R. v. M.H., 689 N.E.2d 790, 793-94
nn. 4-5 (1998).
[22] It is possible that the result would be different in a gestational surrogacy case. Some states have held that the product of a gestational surrogacy agreement is the natural child of the couple who arranged the surrogacy. See footnote 17, above. Thus, in at least some gestational surrogacy arrangements, the intended parents may be considered the natural parents and adoption would be unnecessary. Moreover, since the natural parents have the presumed right to custody, FL § 5-203, there would be a strong argument that payments under the agreement were not for the purchase of custody of the child. However, there is no law in Maryland addressing parentage in this context.
[23] Merely requiring an accounting does not, in our view, require that a court enforce the law against payments by denying the adoption.See In the Matter of the Adoption of Baby A, 877 P.2d 107, 108 (Or.App. 1994).
 *Page 3